2006 ND 237

**Paul GENTER, Claimant and Appellant**

v.

**WORKFORCE SAFETY & INSURANCE FUND, Appellee**

and

**Burleigh County, Respondent.**

**No. 20060145.**

Supreme Court of North Dakota.

Nov. 28, 2006.

Stephen D. Little, Dietz & Little Lawyers, Bismarck, ND, for claimant and appellant.

Lawrence A. Dopson, Special Assistant Attorney General, Bismarck, ND, for appellee.

VANDE WALLE, Chief Justice.

[¶ 1]   Paul Genter appealed from a district court judgment affirming an order of Workforce Safety & Insurance ("WSI") awarding partial disability benefits and requiring him to return to work part-time. Genter argues that WSI did not adequately consider his preexisting hearing loss in formulating his vocational rehabilitation plan.  We affirm.

## I

[¶ 2]   In 1995, while working as an officer with the Burleigh County Sheriff's Department, Genter experienced chest pains that were later diagnosed as congestive heart failure.  WSI accepted his claim and began paying total disability benefits.  At the time of his work-related injury, Genter had been an employee of the Sheriff's Department for about 25 years.  Throughout his employment as a deputy sheriff, Genter suffered from partial hearing loss, a problem which had arisen when he was a child.  He began wearing hearing aids in both ears in the early 1980s and has worn them ever since then.

[¶ 3]   In January 2002, WSI initiated vocational rehabilitation services and attempted to return Genter to work.  Genter was eventually hired by DiCenzo Personnel Specialists and began work on August 27, 2002.  In his position with DiCenzo, Genter worked from his home and conducted surveys over the telephone.  In October 2002, DiCenzo sent Genter a letter evaluating his performance and informing him of the areas in which he could improve.  The next communication from DiCenzo regarding Genter's work performance was a letter dated May 9, 2003.  In this letter, DiCenzo notified Genter that he was not meeting performance standards and warned him that his employment was in "serious jeopardy."  DiCenzo ultimately fired Genter from this position in June 2003 because of his failure to meet call counts and time standards, to properly fill in lead sheets, and to work enough hours per week.

[¶ 4] Shortly after this termination, WSI again initiated vocational rehabilitation services for Genter. Joyce Clock–Olson, a rehabilitation consultant with CorVel Corporation, was assigned to work with Genter. It is undisputed that Clock–Olson was aware of Genter's hearing loss at the time she began working on his file. WSI's referral report, which provided CorVel with information about Genter, listed "partial hearing loss" as one of Genter's other medical conditions. Also, Clock–Olson had previously helped Genter with telephone accommodations for his work with DiCenzo.

[¶ 5] Genter had numerous conversations with Clock–Olson in the course of his vocational rehabilitation, both in person and by telephone. On June 30, 2003, Clock–Olson called to arrange an initial meeting with Genter. At that first meeting, Genter informed Clock–Olson that he has had hearing problems since he was young and that he wears hearing aids in both ears. He also stated that he does not have problems hearing on a one-on-one basis in a quiet room. In her notes from this meeting, Clock–Olson observed that Genter did not have any problem hearing her.

[¶ 6] In late October 2003, Clock–Olson enrolled Genter in a keyboarding class at the Center for Technology and Business to upgrade his computer skills. Both Genter and Clock–Olson informed the instructor of Genter's hearing loss. When Clock–Olson contacted the instructor for a progress report, the instructor stated that she "spoke up" and that Genter did not have trouble hearing her or request that she repeat anything. In December 2003, Genter took an Introduction to Computers class from the same instructor at the Center. The instructor reported that Genter was having some difficulty seeing the computer monitor, but that he was able to keep up with the class and participated by asking good questions.

[¶ 7] On December 30, 2003, Clock–Olson called Genter to discuss another upcoming computer class. Genter was on the other line at the time and asked Clock–Olson if he could return her call later. Sometime later that day, Genter contacted Clock–Olson by telephone, and they discussed his file and the computer class. In January 2004, Clock–Olson contacted Genter by telephone regarding another computer class and noted in her status report that she had to speak louder than usual because Genter was not wearing his hearing aids. In February 2004, Genter called Clock–Olson, and they again spoke on the telephone regarding his file. On May 5, 2004, Clock–Olson conducted a vocational assessment appointment with Genter by telephone to discuss his skills, physical abilities, and job goals. Clock–Olson informed Genter that she would conduct the assessment appointment in person if he had any difficulty hearing or understanding, but Genter did not report having any problems.

[¶ 8] In the final vocational plan, dated August 5, 2004, Clock–Olson concluded that Genter could return to work as either a social services assistant or a security guard. WSI then notified Genter of its intention to reduce his disability benefits and require him to return to work part-time. Genter requested a hearing before an administrative law judge ("ALJ"), claiming that WSI had failed to consider his preexisting physical limitations, including hearing, vision, knee, and back problems, in formulating his vocational rehabilitation plan.

[¶ 9] At the administrative hearing, Genter testified regarding his hearing impairment. He observed that he cannot hear in crowded or noisy environments, and that high-pitched or soft-spoken voices

are difficult for him to hear. He also stated that telephone use poses a problem. In support of his testimony, Genter produced a letter from Keith Telenga, a hearing aid specialist at Medcenter One. Although Genter admitted that he used the telephone during his employment with Burleigh County, he explained that he found it difficult so he preferred to speak with people directly. Genter testified that he "struggled with it and got by." He also claimed that his hearing problem has worsened in the last 10 years, since his employment as a deputy sheriff ended. Regarding his termination from employment with DiCenzo, Genter testified that he could not hear or understand over the telephone, which resulted in his inability to meet performance standards.

[¶ 10] Additionally, at the administrative hearing, Joyce Clock–Olson testified about the job goals of security guard and social services assistant that she had selected for Genter. As to the position of social services assistant, Clock–Olson stated that much of the work is done in person on a one-on-one basis, which complies with the hearing limitations Genter had described to her at their first meeting. With regard to the position of security guard, Clock–Olson testified that it would be similar to the type of work Genter successfully performed in law enforcement with his hearing loss. She also stated that security guard positions vary, with some involving group settings and others involving contact with people on an individualized basis.

[¶ 11] After considering the evidence presented at the administrative hearing, the ALJ made extensive findings of fact and conclusions of law, many of which pertained to Genter's hearing loss, including the following:

> CorVel addressed Genter's "visual and hearing problems" with Ms. Clock–Olson's comments that those problems did

not prevent him from performing his duties in law enforcement, that Genter acknowledged that "he does not have problems hearing people on an individual basis," and that he did not report any difficulty for his transactions with her, including transactions using the telephone.

. . . .

But Ms. Clock–Olson's testimony of her investigation of the particular requirements and duties of the jobs of social services assistant and security guard specified by North Dakota employers and her evaluation of those requirements and duties in the light of her knowledge of Genter's multiple and diverse functional impairments and the advice of Ms. DeKrey and, for what it's worth, the advice of Dr. Bonet and Dr. Lazarow, is together substantial evidence showing that those jobs are, in the words of N.D.C.C. § 65–05.1–01(3), reasonably attainable in light of . . . [his] injury, functional capacities, education, previous occupation, experience, and transferable skills. While it is considered that the complex and interrelated nature of Genter's multiple and diverse functional impairments required a more comprehensive and thorough investigation of employers' requirements and the duties for particular jobs, on balance with the evidence offered by Genter her findings are sufficient, if just so, to support CorVel's conclusions for its vocational plan for Genter.

. . . .

Genter's evidence is not that he was unable to meet the requirements and perform the duties of his work as a deputy sheriff, but that he "struggled and got by." While that is obviously not the circumstance one seeks for a job, Genter worked in that circumstance some twenty years and many workers

must make their living struggling and getting by with the hope that they can do better. The question posed by the statute is whether Genter has the functional capacities and qualifications to compete for employment. The statute does not require that he have the functional capacities to easily perform the work required for a job or the qualifications to be considered well-qualified for a job. The statute requires that Genter have the functional capacities and qualifications such that employment is reasonably attainable. The evidence of record shows that Genter meets those requirements, albeit he may have to struggle and get by for some job for which he may be employed.

The ALJ concluded that the greater weight of the evidence showed that the vocational rehabilitation plan complied with N.D.C.C. ch. 65–05.1 and recommended affirmance of WSI's order. WSI adopted the ALJ's findings of fact and conclusions of law and issued a final order awarding Genter partial disability benefits. Genter then appealed to the district court, which affirmed WSI's decision.

## II

■■■ [¶ 12]  On appeal, we review the decision of the administrative agency, not the district court, although the district court's analysis is entitled to respect. *Toso v. Workforce Safety & Ins.*, 2006 ND 70, ¶ 7, 712 N.W.2d 312. Under N.D.C.C. § 28–32–49, we review the agency's decision in the same manner as the district court. *Ziesch v. Workforce Safety & Ins.*, 2006 ND 99, ¶ 8, 713 N.W.2d 525. The district court must affirm an order of an administrative agency unless it finds any of the following are present:

1. The order in not in accordance with the law.
2. The order is in violation of the constitutional rights of the appellant.
3. The provisions of this chapter have not been complied with in proceedings before the agency.
4. The rules or procedure of the agency have not afforded the appellant a fair hearing.
5. The findings of fact made by the agency are not supported by a preponderance of the evidence.
6. The conclusions of law and order of the agency are not supported by its findings of fact.
7. The findings of fact made by the agency do not sufficiently address the evidence presented to the agency by the appellant.
8. The conclusions of law and order of the agency do not sufficiently explain the agency's rationale for not adopting any contrary recommendations by a hearing officer or an administrative law judge.

*Id.* (citing N.D.C.C. § 28–32–46). We exercise restraint in deciding whether WSI's findings of fact are supported by a preponderance of the evidence, and we do not make independent findings or substitute our judgment for that of WSI. *Paul v. Workforce Safety & Ins.*, 2003 ND 188, ¶ 11, 671 N.W.2d 795. Rather, we determine only whether a reasoning mind reasonably could have decided that WSI's findings were proven by the weight of the evidence from the entire record. *Id.* Questions of law, including the interpretation of a statute, are fully reviewable on appeal from an administrative decision. *Stein v. Workforce Safety & Ins.*, 2006 ND 34, ¶ 6, 710 N.W.2d 364.

## III

[¶ 13]  Genter argues that WSI failed to adequately consider his preexisting hearing loss in formulating his vocational rehabilitation plan. In particular, Genter con-

tends that WSI was required to establish a medical assessment team to evaluate his hearing loss under N.D.C.C. § 65–05.1–02.

[¶ 14] Chapter 65–05.1, N.D.C.C., governs WSI's vocational rehabilitation services. Specifically, N.D.C.C. § 65–05.1–01(3) provides, in relevant part:

It is the goal of vocational rehabilitation to return the disabled employee to substantial gainful employment with a minimum of retraining, as soon as possible after an injury occurs. "Substantial gainful employment" means bona fide work, for remuneration, which is reasonably attainable in light of the individual's injury, functional capacities, education, previous occupation, experience, and transferable skills...."

A rehabilitation plan is appropriate if it satisfies the requirements of N.D.C.C. ch. 65–05.1 and gives the claimant a reasonable opportunity to obtain substantial gainful employment. *Paul v. N.D. Workers Comp. Bureau*, 2002 ND 96, ¶ 8, 644 N.W.2d 884. Under this Court's decision in *Svedberg v. N.D. Workers Comp. Bureau*, 1999 ND 181, ¶ 14, 599 N.W.2d 323, WSI must take a claimant's preexisting functional limitations into account when determining whether certain employment options present an opportunity for substantial gainful employment. The Legislature intended for claimants to be provided with actual rehabilitation, with a realistic opportunity to return to work, and not a theoretical rehabilitation on paper only. *Paul*, 2002 ND 96, ¶ 8, 644 N.W.2d 884 (citing *Svedberg*, 1999 ND 181, ¶ 17, 599 N.W.2d 323). WSI has the burden of establishing that a rehabilitation plan is appropriate. *Hoffman v. N.D. Workers Comp. Bureau*, 2002 ND 138, ¶ 15, 651 N.W.2d 601.

[¶ 15] With regard to his vocational rehabilitation plan, Genter claims that the plan does not meet all the requirements of Chapter 65–05.1. He points in particular to N.D.C.C. § 65–05.1–02(6) and argues that WSI failed to establish a medical assessment team to evaluate his hearing loss. Section 65–05.1–02(6) provides, in relevant part, that WSI shall "[e]stablish medical assessment teams, the composition of which must be determined by the organization *on a case-by-case basis, as the nature of the injury may require*, for the purpose of assessing the worker's physical restrictions and limitations" (emphasis added). The plain language of the statute gives WSI two discretionary decisions regarding the medical assessment team. First, WSI shall establish medical assessment teams as the nature of the injury may require. This is a threshold inquiry in which WSI must determine whether a medical assessment team is required in a particular case based on the nature of the claimed injury. Second, if a medical assessment team is required to evaluate an injury, the plain language of the statute allows WSI to determine the composition of that medical assessment team on a case-by-case basis. *See Thompson v. N.D. Workers' Comp. Bureau*, 490 N.W.2d 248, 253 (N.D.1992).

[¶ 16] Here, it is clear that WSI did take Genter's preexisting hearing loss into account when developing and approving the employment options in his vocational rehabilitation plan. Joyce Clock–Olson selected the positions of social services assistant and security guard based on Genter's prior experience working in law enforcement with his hearing loss, as well as Genter's own explanation of his hearing impairment. Genter stated that he could hear on an individualized basis in a quiet room, and Clock–Olson testified that some social services assistant and security guard positions are performed in this type of environment. Additionally, it was reasonable for Clock–Olson to take into account

the fact that Genter had successfully held a position with the Burleigh County Sheriff's Department for about 15 years after he began wearing hearing aids in both ears. Based on Genter's work history, Clock–Olson concluded that the position of security guard would be appropriate despite his partial hearing loss. Therefore, WSI considered Genter's preexisting functional limitations as required by this Court in *Svedberg*.

[¶ 17] Furthermore, on the facts of this case, we conclude that WSI reasonably exercised its discretion under N.D.C.C. § 65–05.1–02(6) when it determined that the nature of Genter's hearing loss did not require the establishment of a medical assessment team to evaluate his physical restrictions and limitations. Based on the evidence before it, WSI was able to assess the limitations imposed by Genter's hearing loss without establishing a medical assessment team. First, WSI relied on Genter's description of the limitations imposed by his hearing impairment and selected the positions in light of that description. Second, the evidence indicates that Genter was consistently able to hear and communicate with others throughout the course of his vocational plan development. Clock–Olson had multiple conversations with Genter, including many telephone conversations, and observed that Genter did not have any problems hearing her. Genter's instructor at the Center for Technology and Business also observed that he participated in class by asking questions and did not complain of any hearing problems. Third, and perhaps most importantly, the evidence shows that Genter worked as a deputy sheriff for almost 25 years with his hearing loss, and he wore hearing aids in both ears for about 15 of those years. WSI reasonably took this work history into account when determining the nature of Genter's hearing impairment and deciding whether to seek a medical opinion.

[¶ 18] At the administrative hearing, Genter testified that his hearing impairment has worsened since his work-related injury in 1995, such that it prevents him from returning to work. Genter offered only the letter from Keith Telenga, the hearing aid specialist, in support of this claim. There is no medical evidence in the record regarding the alleged worsening of his preexisting hearing loss. Moreover, Genter claims that he was fired from his position with DiCenzo because he could not hear well enough to perform the required tasks. However, the record does not contain any other support for this statement. Genter did receive help with telephone accommodations from Joyce Clock–Olson, but he also worked for DiCenzo for a 6–month period during which there were no communications regarding deficient performance. Furthermore, there is no evidence that Genter ever attempted to explain to DiCenzo why he was having trouble meeting the performance standards, even after DiCenzo notified him in May 2003 that his employment was in serious jeopardy.

[¶ 19] Section 65–05.1–02(6), N.D.C.C., gives WSI the discretion to establish medical assessment teams as the nature of the injury may require. Furthermore, if a medical assessment team is required, the statute gives WSI the discretion to determine the composition of the team on a case-by-case basis. WSI is not automatically required to establish a medical assessment team and seek a medical opinion in every case in which a worker claims an injury or preexisting condition, regardless of the factual basis for the worker's claim. In this case, we conclude that WSI acted reasonably and within its discretion when it assessed the limitations imposed by Genter's hearing loss without

establishing a medical assessment team. Based on Genter's own description of his hearing loss, the observations of others regarding his hearing impairment, and Genter's ability to work as a deputy sheriff for many years despite his hearing loss, WSI was able to sufficiently determine the nature of his preexisting hearing loss and select positions that provide him with a reasonable opportunity to obtain substantial gainful employment.

## IV

[¶ 20] The district court judgment affirming WSI's order awarding partial disability benefits is affirmed.

[¶ 21] DALE V. SANDSTROM, DANIEL J. CROTHERS, and CAROL RONNING KAPSNER, JJ., concur.

MARING, Justice, dissenting.

[¶ 22] I respectfully dissent. I believe the majority has failed to follow this Court's own decision in *Svedberg v. N.D. Workers Comp. Bureau,* 1999 ND 181, 599 N.W.2d 323, and has misinterpreted the plain language of N.D.C.C. § 65–05.1–02(6). Because I believe a medical assessment team should have been established to assess Genter's preexisting hearing loss before WSI formulated his vocational rehabilitation plan, I would reverse and remand.

[¶ 23] In *Svedberg,* Arlo Svedberg had worked for Community News since 1984 as a reporter, photographer, and advertising salesman. 1999 ND 181, ¶ 2, 599 N.W.2d 323. He also performed other tasks for the business, such as snow shoveling and newspaper delivery. *Id.* In 1995, Svedberg injured his right shoulder during work. *Id.* Surgery was needed to repair the injury. *Id.* The Workers Compensation Bureau ("Bureau") accepted Svedberg's claim and paid his benefits. *Id.* In 1969, while he was a firefighter in Grand Forks, Svedberg suffered a back injury that required surgery. *Id.* at ¶ 3. After twice reinjuring his back, Svedberg required two more surgeries. *Id.* Svedberg also suffered from personality disorders and panic attacks. *Id.* at ¶ 4.

[¶ 24] CorVel Corporation, the Bureau's vocational consultant, was retained to create a vocational rehabilitation plan for Svedberg. *Id.* at ¶ 5. CorVel's initial plan called for Svedberg to return to Community News, but in a modified position. *Id.* The Bureau rejected CorVel's initial plan and directed CorVel to explore alternative options and amend the plan. *Id.* The Bureau approved CorVel's amended vocational rehabilitation plan. *Id.* at ¶ 7. In creating the vocational rehabilitation plan, CorVel did not consider Svedberg's prior back injuries and psychological problems when determining appropriate employment options. *Id.* at ¶ 9. Svedberg's treating physician did not consider the prior injuries or problems when he approved the employment options in the plan. *Id.*

[¶ 25] Like Svedberg, Genter had medical conditions that preexisted the work-related injury that became the basis of his WSI claim. Both men had serious conditions that limited their abilities to engage in certain types of employment. Unfortunately, despite similar situations, Genter has not been given the same opportunity to have his preexisting functional limitations properly considered in the formation of his vocational rehabilitation plan. Therefore, I must dissent because Genter is not receiving the rights afforded him by *Svedberg* and N.D.C.C. § 65–05.1–02(6).

[¶ 26] In *Svedberg,* this Court stated, "[t]he crucial question presented in this case is whether a vocational rehabilitation plan must take into account all of the injured worker's functional limitations existing at the time of the injury, or only

those directly caused by the current work injury." *Id.* at ¶ 10. "[F]unctional limitations which existed at the time the claimant was performing the job are elements of the employee as the employer 'found' him, and are valid factors which should be taken into consideration when the Bureau determines whether certain employment options present an opportunity for 'substantial gainful employment.'" *Id.* at ¶ 14.

[¶ 27] WSI, through the work of Joyce Clock–Olson, a rehabilitation consultant with CorVel, investigated and took into account Genter's functional limitations at the time of his injury when assessing his employment options. However, a rehabilitation consultant's apparent compliance with *Svedberg* does not satisfy WSI's responsibilities to an injured worker. WSI must also comply with N.D.C.C. § 65–05.1–02(6) to meet the goals of rehabilitative services.

[¶ 28] Under N.D.C.C. § 65–05.1–02(6), WSI "*shall* … [e]stablish medical assessment teams, the composition of which must be determined by the organization on a case-by-case basis, as the nature of the injury may require, for the purpose of assessing the worker's physical restrictions and limitations." (Emphasis added.) In *Svedberg*, this Court made clear, "[i]n order to carry out the stated goals of the rehabilitation statutes, the Bureau is *required* to establish a medical assessment team on a case-by-case basis to assess 'the worker's physical restrictions and limitations.'" 1999 ND 181, ¶ 15, 599 N.W.2d 323 (emphasis added). "The vocational consultant must then assess the worker's job options in light of those restrictions and limitations." *Id.* at ¶ 15 (citing *Johnson v. N.D. Workers' Comp. Bureau*, 539 N.W.2d 295, 298 (N.D.1995); N.D.C.C. § 65–05.1–02(7)).

[¶ 29] The requirement to assess preexisting conditions and to take into account preexisting functional limitations when creating a vocational rehabilitation plan is not satisfied merely by having a rehabilitation consultant make observations about a claimant. In *Svedberg*, this Court did not end its analysis when it concluded preexisting functional limitations must be considered. 1999 ND 181, ¶ 15, 599 N.W.2d 323. We held that for WSI "to carry out the stated goals of the rehabilitation statutes," it had to satisfy N.D.C.C. § 65–05.1–02(6). *Svedberg*, at ¶ 15. The plain language of N.D.C.C. § 65–05.1–02(6) indicates a medical assessment team *shall* be established. "Shall" means "[h]as a duty to; more broadly, is required to…. This is the mandatory sense that drafters typically intend and that courts typically uphold." *Black's Law Dictionary* 1407 (8th ed.2004). The North Dakota Legislative Drafting Manual provides: "Use *shall* when you are imposing a duty on a person or body that is the subject in the sentence. Use *shall* in a mandatory or imperative sense." *North Dakota Legislative Drafting Manual* 97 (2005). The plain language of N.D.C.C. § 65–05.1–02(6) and case law makes clear WSI is required to establish a medical assessment team. The vocational consultant's role of assessing the worker's job options only begins after the medical assessment team has assessed the worker's physical restrictions and limitations. Although required by statute, a medical assessment team was not established to review Genter's preexisting functional limitations.

[¶ 30] The majority, at ¶ 15, misinterprets N.D.C.C. § 65–05.1–02(6) to mean that WSI has the option of establishing a medical assessment team. A precise reading of the statute indicates that WSI is required to establish medical assessment teams. WSI had the discretion to determine the composition of the team on a

case-by-case basis depending on the nature of the injury. Each type of injury may dictate a different team composition. One injury may require five experts in a particular applicable field. Another may require three physical therapists. Such decisions as to the composition of the teams are to be made by WSI. However, the decision of whether to establish a medical assessment team is not within WSI's discretion.

[¶ 31] A review of the legislative history of N.D.C.C. § 65–05.1–02 supports this view. In 1989, at the request of the Workers Compensation Bureau, the legislature, in H.B. 1191, amended section 65–05.1–02.1989 N.D. Sess. Laws ch. 771, § 2. Testifying in support of H.B. 1191, Dean Haas, legal counsel for the Workers Compensation Bureau, explained:

Section 2, page 3, paragraph six, provides that the Bureau *must establish medical assessment teams to assess the workers['] physical capabilities. Medical information is crucial* to a determination of eligibility for vocational services.... Currently, each worker is evaluated by his own treating physician. This process results in wide divergence of eligibility determination depending upon the beneficence of the doctor. The Bureau *seeks to obtain more fairness and equity by ensuring that workers are judged by the same criteria.* Only through an independent assessment approach can we obtain uniformity. The assessment teams ought to be able to become proficient at evaluating workers for physical capabilities and ensure fairness and uniformity for similarly injured workers. *Hearing on H.B. 1191 Before the Senate Committee on Industry, Business, and Labor,* 51st N.D. Legis. Sess. (March 8, 1989) (testimony of Dean Haas, legal counsel for the Workers Comp. Bureau) (emphasis added).

[¶ 32] The majority, at ¶ 15, cites *Thompson v. N.D. Workers' Comp. Bureau,* 490 N.W.2d 248 (N.D.1992), in support of its interpretation of N.D.C.C. § 65–05.1–02(6). However, this support only applies to WSI's discretion to determine the composition of the medical assessment team on a case-by-case basis. The majority does not provide any precedent or other support for deciding WSI has discretion to decide whether to establish a medical assessment team in the first place. In *Thompson,* we said: "Section 65–05.1–02(6), N.D.C.C., *requires* the Bureau to establish a medical assessment team on a case-by-case basis to determine the worker's physical restrictions and limitations. The plain language of the statute allows the Bureau to determine the composition of the medical assessment team on a case-by-case basis." 490 N.W.2d at 253 (emphasis added). There is no discretion whether to establish a medical assessment team. This is required by the statute. The only discretion allowed pertains to the composition of the team. Because a medical assessment team was not established, in violation of N.D.C.C. § 65–05.1–02(6), Genter's preexisting functional limitations were not properly considered when creating his vocational rehabilitation plan.

[¶ 33] "If the Bureau, the consultant, the medical assessment team, and the treating physician assess the claimant as a hypothetical 'perfect' individual with only the current work-related disability, and do not take the worker's actual whole-person functional capacities into account, any vocational rehabilitation plan based upon that assessment will be flawed and unworkable." *Svedberg,* 1999 ND 181, ¶ 17, 599 N.W.2d 323. The majority notes, at ¶ 16, that WSI took into account Genter's preexisting hearing loss when developing his vocational rehabilitation plan. However, this was only done by a rehabilitation consultant, without a medi-

cal assessment team assessing Genter's physical limitations and restrictions. Consideration of the worker's "actual whole-person functional capacities" must still be done properly. The fact that Clock–Olson considered Genter's hearing loss is not persuasive because she is not a physician and is not qualified to make a determination of Genter's functional limitations. Without a medical assessment team, WSI did not satisfactorily assess Genter's preexisting functional limitations.

[¶ 34] To support its holding that WSI considered Genter's preexisting functional limitations, the majority, at ¶ 17, gives credence to Clock–Olson's consideration of Genter's fifteen years of employment at the Burleigh County Sheriff's Department, during which he was wearing a hearing aid in each ear. Because he worked at the sheriff's department while suffering hearing loss, the majority reasons, it is reasonable to believe he can now work as a security guard, as Clock–Olson recommended. However, the record shows Genter worked at the sheriff's department for the last time in 1995. Perhaps his hearing loss did not prevent him from performing his duties at the sheriff's department in 1995, or perhaps he had been working there so long that he knew how to compensate for his hearing loss because of his experience on the job. I do not understand how the fact that Genter was able to work at the sheriff's department over ten years ago, despite a hearing problem, means that eleven years later he is therefore qualified to be a security guard. Clock–Olson's disproportionate reliance on a job Genter last performed in 1995, perhaps, indicates why the legislature required establishment of medical assessment teams at the request of the North Dakota Workers Compensation Bureau.

[¶ 35] The majority, at ¶ 18, points to a lack of medical evidence on the record that Genter's hearing has worsened since his injury in 1995. The lack of medical evidence is a direct result of WSI's failure to establish a medical assessment team. A medical assessment team would have been able to determine whether Genter's hearing has worsened or at least determine the current status of his hearing. A medical assessment team would make a much more authoritative finding on the condition of Genter's hearing than could Clock–Olson. Any uncertainties about Genter's preexisting functional limitations could have been addressed by a medical assessment team. Instead, WSI, and the majority, relied on the anecdotal observations of a rehabilitation consultant who is not qualified to make assessments about an individual's hearing loss or capacity, when approving the vocational rehabilitation plan.

[¶ 36] "We believe the legislature's intent was to create a process which leads to real rehabilitation and reemployment, not a theoretical rehabilitation which ignores the injured worker's actual situation. At some point the Bureau must recognize it is dealing with real people, not merely statistics and notations in a file." *Svedberg*, 1999 ND 181, ¶ 19, 599 N.W.2d 323. By failing to enlist the services of a medical assessment team, as required by N.D.C.C. § 65–05.1–02(6), WSI partially ignored Genter's actual situation. Genter has hearing loss in both ears that may prevent him from performing the jobs Clock–Olson recommended. The only way to know for sure is by properly establishing a medical assessment team which will assess Genter's physical limitations and restrictions.

[¶ 37] A medical assessment team may or may not reach a different conclusion than Clock–Olson. However, Genter is owed by statute the opportunity to have a medical assessment team established to assess his preexisting functional limitations. Genter was denied this right. In-

stead, WSI based its vocational rehabilitation plan on Clock–Olson's observations and Genter's own statements about his hearing condition. It is interesting to note that WSI relies on Genter's testimony about situations in which he can hear, but then rejects Genter's testimony that his hearing has worsened over the last eleven years. However, as the majority, at ¶ 14, points out, the burden is on WSI to establish that a vocational rehabilitation plan is appropriate. WSI, and the majority, reason that there is no medical evidence to support Genter's testimony, yet there is no medical evidence to support WSI's findings either.

[¶ 38]   This case should be reversed and remanded so that WSI can establish a medical assessment team, amend the vocational rehabilitation plan based on the team's findings, and, if necessary, determine more appropriate employment options for Genter.

[¶ 39]   Mary Muehlen Maring