2010 ND 13

**Richard J. SHOTBOLT, Claimant and Appellant**

v.

**NORTH DAKOTA WORKFORCE SAFETY AND INSURANCE, Appellee**

and

**Industrial Contractors, Inc., Respondent.**

No. 20090120.

Supreme Court of North Dakota.

Jan. 15, 2010.

Stephen D. Little, Bismarck, N.D., for claimant and appellant.

Douglas W. Gigler, Special Assistant Attorney General, Fargo, N.D., for appellee.

MARING, Justice.

[¶ 1] Richard Shotbolt appeals from a district court judgment affirming an order by Workforce Safety & Insurance ("WSI"), which denied Shotbolt further disability and vocational rehabilitation benefits and required him to return to work in the same occupation with any employer. Because we conclude a reasoning mind could reasonably conclude from the weight of the evidence that WSI's vocational rehabilitation plan requiring Shotbolt return to the same occupation with any employer under N.D.C.C. § 65–05.1–01(4)(b), was the first appropriate rehabilitation option for Shotbolt, we affirm.

I

[¶ 2] In December 2005, Shotbolt submitted a claim for WSI benefits for a work injury to his left bicep, after he ruptured the distal bicep tendon of his left elbow while moving a piece of heavy equipment on December 8, 2005. Shotbolt was a journeyman electrician working for Industrial Contractors, Inc. at the Leland Olds power plant in Stanton, North Dakota. WSI accepted liability for the work injury on December 9, 2005. After the injury and initial medical treatment in Bismarck, Shotbolt returned home to Michigan and treated with Dr. Lawrence McMaster, who had been his treating physician since 2001. Dr. McMaster referred Shotbolt to Dr. Homer Linard, an orthopedic surgeon, who performed surgical repairs of Shotbolt's tendon rupture on December 22, 2005. Shotbolt's left arm was placed in a fiberglass cast after surgery and he was taken off work.

[¶ 3] In February 2006, Dr. Linard saw Shotbolt for a recheck of his left arm and

removed and replaced the cast with a left arm sling with an elbow brace. Dr. Linard prescribed physical therapy and released Shotbolt to return to work "with restrictions of no use of the left arm." Between February and June 2006, Shotbolt attended 25 physical therapy sessions.

[¶ 4] In March 2006, WSI initiated vocational rehabilitation services for Shotbolt with CorVel after being advised that Shotbolt would not be asked to return to work with Industrial Contractors following his recovery. In April 2006, CorVel wrote a letter to Dr. Linard inquiring when Shotbolt would be medically able to return to work without any restrictions. Dr. Linard again examined Shotbolt in April 2006, observing he had "nearly full extension and full flexion" and that his strength was "slowly improving." Dr. Linard then recommended that Shotbolt be more aggressive with his rehabilitation and that he could return to work "with moderate use of the left arm, no lifting over 15 pounds."

[¶ 5] On May 5, 2006, Dr. Linard again examined Shotbolt and observed that he had a good range of motion of the left elbow, had some weakness of the biceps, but indicated this would improve over time. On that date, Dr. Linard released Shotbolt to work with no restrictions. After receipt of Dr. Linard's full work release, CorVel issued a vocational consultant's report that recommended the "return to same occupation, any employer" option. On May 23, 2006, WSI informed Shotbolt that it approved CorVel's recommended rehabilitation option. In June 2006, in response to an inquiry from WSI, Dr. Linard advised WSI that Shotbolt had reached maximum medical improvement and that Shotbolt had no permanent impairment to his left bicep as a result of the work injury.

[¶ 6] Meanwhile, on June 2, 2006, Dr. McMaster saw Shotbolt, who was complaining of left shoulder pain after injuring his left shoulder while wearing the cast on his arm following surgery. Dr. McMaster examined Shotbolt and observed the "[b]iceps area still is not as strong as the right." Dr. McMaster then prescribed physical therapy for the left shoulder and continued therapy for the left bicep. Between June and August 2006, Shotbolt attended 14 sessions of physical therapy.

[¶ 7] In October 2006, Shotbolt had surgery to repair an aortic and iliac aneurysm. In January 2007, Dr. McMaster again saw Shotbolt, who was complaining of left bicep weakness and pain and numbness in his left leg. Shotbolt told Dr. McMaster that he had been unable to work because of weakness in the bicep and continued to have left leg pain and numbness in his left foot since the October 2006 surgery. Dr. McMaster referred Shotbolt to the Physical Medicine and Rehabilitation Clinic for evaluation based on chronic left leg pain following the surgery and for Shotbolt's left upper arm.

[¶ 8] On January 17, 2007, Dr. Joseph Hornyak with the Physical Medicine and Rehabilitation Clinic evaluated Shotbolt. Dr. Hornyak noted Shotbolt's past medical history included peripheral vascular occlusive disease, an aortic and iliac aneurysm which was repaired in October 2006, a cerebral aneurysm "which was surgically clipped at an outside facility," and Reiter's syndrome "affecting mostly of the joints including the knees and ankles of lower extremity." Dr. Hornyak's examination of Shotbolt's left upper extremity revealed "bicep strength 4/5" and assessed Shotbolt with "chronic bicep weakness status post bicep rupture and repair in 2005 and left leg numbness positional symptoms consistent with diagnosed left-sided claudication and possible weakness in the left gastroc."

[¶ 9] On January 23, 2007, Shotbolt underwent an EMG. On February 7, 2007,

Dr. Hornyak reviewed the EMG results with Shotbolt, which showed "chronic denervation, reinnernvation injury to the left biceps," however no evidence of "cervical radiculopathy, plexopathy, or neuropathy," and no evidence of "ongoing nerve damage." Dr. Hornyak stated regarding the left bicep weakness, that it was chronic and stable, was unlikely Shotbolt would gain any additional strength at that time, and that his strength was likely stable at the current functional level. Dr. Hornyak did not recommend any specific therapy or interventions and advised Shotbolt should continue with his normal activities as tolerated. Dr. Hornyak found the EMG of Shotbolt's left lower extremity was normal and advised Shotbolt to build exercise tolerance to reduce any pain in lower extremity claudication.

[¶ 10] In March 2007, Shotbolt returned to Dr. McMaster, who noted Shotbolt's continuing problems with his left leg and arm. Dr. McMaster noted that Shotbolt's physical examination was unchanged since his last visit. Dr. McMaster's assessment was "[c]hronic left upper extremity weakness" and left leg numbness, possibly due to claudication. On March 2, 2007, Dr. McMaster wrote a letter to advise that Shotbolt was "unable to return to work because of the arm injury."

[¶ 11] Based upon the conflicting medical opinions of Dr. McMaster and Dr. Linard, WSI ordered Shotbolt to undergo a functional capacity assessment ("FCA") to assist in ascertaining whether Shotbolt could perform the duties of a journeyman electrician, which was performed on June 22, 2007. WSI then provided the FCA results, a job description for an electrician, and Shotbolt's medical records to Dr. Gregory Peterson, WSI's medical consultant, for a medical opinion on whether the work injury would prevent Shotbolt from returning to work as an electrician.

[¶ 12] Dr. Peterson opined that the work injury would not prevent Shotbolt from performing the duties of an electrician. Dr. Peterson specifically disagreed with Dr. McMaster's opinion in his March 2, 2007, letter finding it to be conclusory and unsupported by objective findings. Dr. Peterson agreed with Dr. Linard's full work release on May 5, 2005. Dr. Peterson indicated that Dr. Linard's opinion was consistent with the "nature of Mr. Shotbolt's left arm condition, the expected natural history, the objective findings, and Dr. Linard's expertise as an orthopedic surgeon."

[¶ 13] In an April 7, 2008, letter, Dr. McMaster responded to Dr. Peterson's opinion, noting that Shotbolt continued to have left arm weakness, which according to Shotbolt, resulted in limitations. Although Dr. McMaster was "not able to see what Mr. Shotbolt's job entails," Dr. McMaster continued to opine that Shotbolt's injury prevented him from returning to his pre-injury work.

[¶ 14] In June 2006, WSI issued its formal order denying further disability and vocational rehabilitation benefits. In August 2006, Shotbolt requested reconsideration and a formal hearing. In May 2008, after several continuances, a hearing was held on Shotbolt's August 2006 request for reconsideration of WSI's order denying him further disability and vocational rehabilitation benefits and determining his first available rehabilitation option was returning to the same occupation with a different employer before an administrative law judge ("ALJ"). In July 2008, the ALJ issued his recommended findings of fact, conclusions of law, and order, affirming WSI's order denying further disability and vocational rehabilitation benefits. The ALJ concluded a preponderance of the evidence established that Shotbolt could work as an electrician and that WSI had

correctly identified the first appropriate rehabilitation option that would provide Shotbolt with a reasonable opportunity for substantial gainful employment. WSI adopted the ALJ's recommendation and the district court affirmed WSI's order.

## II

[¶ 15] Courts exercise a limited review in appeals from administrative agency decisions under the Administrative Agencies Practice Act, N.D.C.C. ch. 28–32. *Bergum v. North Dakota Workforce Safety & Ins.*, 2009 ND 52, ¶ 8, 764 N.W.2d 178. Under N.D.C.C. §§ 28–32–46 and 28–32–49, the district court, and this Court on further appeal, must affirm an administrative agency decision unless:

1. The order is not in accordance with the law.

2. The order is in violation of the constitutional rights of the appellant.

3. The provisions of [N.D.C.C. ch. 28–32] have not been complied with in the proceedings before the agency.

4. The rules or procedure of the agency have not afforded the appellant a fair hearing.

5. The findings of fact made by the agency are not supported by a preponderance of the evidence.

6. The conclusions of law and order of the agency are not supported by its findings of fact.

7. The findings of fact made by the agency do not sufficiently address the evidence presented to the agency by the appellant.

8. The conclusions of law and order of the agency do not sufficiently explain the agency's rationale for not adopting any contrary recommendations by a hearing officer or an administrative law judge.

On appeal from the district court's decision, we review the administrative agency's decision in the same manner as the district court, giving due respect to the district court's analysis and review. N.D.C.C. § 28–32–49; *Von Ruden v. North Dakota Workforce Safety & Ins. Fund,* 2008 ND 166, ¶ 8, 755 N.W.2d 885.

[¶ 16] This Court exercises restraint in deciding whether WSI's findings of fact are supported by a preponderance of the evidence, and we do not make independent findings or substitute our judgment for that of WSI. *See Reopelle v. Workforce Safety & Ins.,* 2008 ND 98, ¶ 9, 748 N.W.2d 722. "On appeal, we determine whether a reasoning mind reasonably could have decided the agency's findings were proven by the weight of the evidence from the entire record, however, questions of law are fully reviewable." *Von Ruden,* 2008 ND 166, ¶ 8, 755 N.W.2d 885.

## III

[¶ 17] The dispositive issue in this case is whether WSI's vocational rehabilitation plan was appropriate under N.D.C.C. § 65–05.1–01, which endeavors to return an injured worker to substantial gainful employment as soon as possible after the injury and provides, in relevant part:

4. The first appropriate option among the following, calculated to return the employee to substantial gainful employment, must be chosen for the employee:

    a. Return to the same position.

    b. *Return to the same occupation, any employer.*

    c. Return to a modified position.

    d. Return to a modified or alternative occupation, any employer.

. . . .

(Emphasis added.)

[¶ 18] On appeal, Shotbolt argues WSI's vocational rehabilitation plan to return him to the same occupation with any employer is inappropriate, because he does not have the physical ability to work as a journeyman electrician. He argues WSI's findings of fact are not supported by the greater weight of the evidence. WSI, however, argues it could reasonably have concluded from the weight of the evidence that its rehabilitation plan was the first appropriate vocational rehabilitation option for Shotbolt.

[¶ 19] The clear intent of N.D.C.C. ch. 65–05.1 is to rehabilitate an injured worker so the worker may return to substantial gainful employment, meaning actual rehabilitation with a realistic opportunity to return to work. *Svedberg v. North Dakota Workers Comp. Bur.,* 1999 ND 181, ¶ 17, 599 N.W.2d 323. A rehabilitation plan is appropriate when it meets the requirements of N.D.C.C. ch. 65–05.1 and gives the claimant a reasonable opportunity to obtain employment. *Paul v. North Dakota Workers Comp. Bur.,* 2002 ND 96, ¶ 8, 644 N.W.2d 884; *Lucier v. North Dakota Workers Comp. Bur.,* 556 N.W.2d 56, 59 (N.D.1996).

[¶ 20] Additionally, "WSI must take a claimant's preexisting functional limitations into account when determining whether certain employment options present an opportunity for substantial gainful employment." *Genter v. Workforce Safety & Ins. Fund,* 2006 ND 237, ¶ 14, 724 N.W.2d 132; *see also Svedberg,* 1999 ND 181, ¶ 17, 599 N.W.2d 323 ("When the work-related injury makes return to the same job or occupation impossible, and the focus of rehabilitation turns to transferable skills and other occupations, common sense dictates that the worker's actual functional abilities must be considered if the vocational rehabilitation plan is to be meaningful."). The burden is on WSI to establish that a vocational rehabilitation plan is appropriate. *Genter,* ¶ 14; *Hoffman v. North Dakota Workers Comp. Bur.,* 2002 ND 138, ¶ 15, 651 N.W.2d 601.

[¶ 21] "In assessing the validity of a vocational rehabilitation plan, 'the question is whether the plan, at the time, gave [the injured worker] a reasonable opportunity to obtain substantial gainful employment in the state.'" *Svedberg,* at ¶ 16 (quoting *Lucier,* 556 N.W.2d at 60). Under this Court's standard of review, WSI's selection of a vocational rehabilitation plan will not be reversed when there is "evidence from which a reasoning mind could have reasonably concluded that the rehabilitation plan would return [the injured worker] to substantial gainful employment which was reasonably attainable in light of his injury and which would substantially rehabilitate his earning capacity . . . ." *Thompson v. North Dakota Workers' Comp. Bur.,* 490 N.W.2d 248, 255 (N.D.1992).

[¶ 22] After considering the evidence presented at the administrative hearing, the ALJ made extensive findings of facts and conclusions of law, which WSI adopted as its final order. In its findings of fact, the ALJ summarized Shotbolt's medical treatment and also made specific findings regarding Shotbolt's testimony:

33. [Shotbolt] is age 57, lives in Belleville, Michigan and appeared via telephone. He has a high school education, took an electrical apprenticeship, became a journeyman electrician in 1973 and was never employed in any other field. He has been licensed in several states.

[Shotbolt] states that before the date of the accident, he had no problems with his left leg and any problems surfaced

only after surgery for an aneurysm. In September of 1996 he had a rupture in his brain repaired by surgery. He did go back to work after several months, but he required a partner to help with climbing. [Shotbolt] had left leg surgery in October of 2006.

[Shotbolt] states that the day of the accident, [December 8, 2005,] he was working around Stanton, ND, [and] was helping someone move some switchgear and the switchgear fell against his arm. He believes the switchgear weighed between 80 and 90 pounds, was about five feet high, about three and one-half feet wide, and approximately 18 inches deep. He stated that in the course of his duties and employment before the accident he worked with cables of various lengths and weights and was able to lift these cables into place, but he says he is not strong enough to lift that weight anymore. He says he cannot physically do the work and it would not be safe for others if he tried.

[Shotbolt] explained that he could perform some aspects of an electrician's job that would involve lighter wire and cables.

[Shotbolt] agreed that Dr. McMaster was his treating doctor both before and after the injury.

[Shotbolt] stated he has not worked since December of 2005 and is currently receiving Social Security disability benefits. He was granted benefits back to March of 2006 but was not sure whether this was before his leg injury or not. He seemed to think his Social Security is separate and that the Social Security Administration may have some claim against the benefits if there were any awarded in this case.

[Shotbolt] has always been a union electrician. He tends to get his jobs through the union hall. In the process of that, he could end up being called to work virtually anywhere in the country. He said he could do residential electrician work except that he is not currently up to code and would have to have that done but he could do the work if he had to. He didn't consider any level of work beneath him. He has not been involved in any kind of industrial work since the accident. He has gone to the union hall to sign the list but just hasn't had calls.

[¶ 23] The ALJ heard conflicting medical evidence regarding Shotbolt's work injury and recovery, in addition to whether he could return to work as an electrician, and the ALJ made specific findings regarding the conflicting medical evidence:

A. Medical Opinions. In this case medical opinions conflict. . . .

Three medical doctors have provided differing opinions to consider: Dr. Linard, Dr. McMaster, and Dr. Peterson.

A. On June 12, 2006, Dr. Linard indicated that Claimant had reached maximum medical improvement, there was no permanent impairment as a result of the work injury, and as a consequence, there was no impairment rating of at least 16% whole body. He had earlier released Claimant to work without restrictions.

B. In March, 2007, Dr. McMaster gave his opinion that Claimant could not return to work. On August 19, 2007, Dr. McMaster found that Claimant was "unable to perform as an electrician", determining that the job required use of both hands." On May 5, 2006, Dr. McMaster had returned claimant to work without restrictions. On April 7, 2008, he rendered his opinion stating:

"Since I am not able to see what Mr. Shotbolt's job entails, I continue to feel that his injury prevents him from returning back to his pre-injury status."

C. Dr. Gregory Peterson in a letter on February 6, 2008, stated:

"My opinion, based on a reasonable degree of medical certainty, is that Mr. Shotbolt's left distal biceps tendon injury result in no significant limitation in his described work activities. I believe that he has some minor decrease in his arm flexion strength in his non-dominant left arm, but this represents no significant impairment in his duties as an electrician."

His letter went on at some length. Dr. Peterson also testified at the hearing and provided the same opinion in greater detail.

In analyzing the opinions of these doctors, this ALJ considers the following:

A. Dr. Linard as an orthopedic surgeon, a speciality that renders him highly qualified to give an opinion regarding the type of injury suffered by the Claimant, the status of recovery or healing, and the ability of the Claimant to work following recovery. While Dr. Linard stated his "findings", and did not use the "medical opinion" words, his observations about the Claimant's ability to return to work without restrictions is tantamount to an opinion. He performed surgery to repair Claimant's injury and followed Claimant through his recovery for some time.

B. Dr. McMaster is an internal medicine specialist who was Claimant's primary doctor before and after the injury. An internal medicine specialist does not have, at least based on the testimony of Dr. Peterson, the knowledge or background to credibly determine the Claimant's ability to return to work. His opinion further is really not supported by any objective medical evidence.

C. Dr. Peterson did not meet or treat the Claimant. He lacks that advantage. His opinions are based upon his review of all of the medical records in the case and he uses the phrase "reasonable degree of medical certainty". His specialty is in the field of physical medicine and rehabilitation, and his experience as described in his testimony renders his opinions credible and thorough. Between his letter and his testimony he provided a complete and detailed analysis of Claimant's medical situation and showed the objective medical evidence that supported his opinions. While the "length" of Dr. Peterson's testimony and letter, and the number of words he used to convey his message are not of themselves controlling, it can't be argued that the record does not contain many times the volume of evidence from Dr. Peterson as compared to that from Drs. Linard and McMaster combined.

Therefore, the opinions of Dr. Linard and Dr. Peterson are accepted, and the opinion of Dr. McMaster is rejected.

B. Evidence of Claimant's disability. A somewhat perplexing aspect of the case involves Claimant's testimony that he has applied for Social Security disability and was awarded disability benefits back to March 2006. The record contains no exhibits that document or support Claimant's testimony, or provide any medical evidence that supported the decision. Dr. Peterson in his testimony did note that Claimant did have other disabling conditions including low back pain (he was off work for one year because of that), left leg vascular condition, Reiter's Syndrome, (a form of arthritis), knee pain, and shoulder pain. There seems to have been adequate time for Claimant to have secured and presented here adequate evidence, including any

applicable medical evidence, that related to any proceeding before the Social Security Administration and the basis for any finding of disability. Such evidence would have been relevant, as in determining the appropriate rehabilitation option, WSI must consider more than just the work injury; it must consider any other conditions that exist.

Somewhat of a similar situation was considered in *Stenvold v. Workforce Safety and Insurance*, 2006 ND 197, 722 N.W.2d 365. There, new medical evidence was obtained and submitted after WSI had entered a final order terminating disability benefits because the identified rehabilitation plan provided her with "reasonable opportunity for substantial gainful employment." The Supreme Court determined that evidence not before the ALJ or WSI could not be considered on appeal. Thus evidence not before the ALJ or WSI at this stage of the case cannot be considered.

The ALJ then made further factual findings regarding Shotbolt's ability to return to work as an electrician:

34. A preponderance of the evidence establishes that the Claimant is able to return to work as an electrician, his life long career. Claimant testified that he could work as an electrician.

35. There is no evidence in the record which provides any details concerning Claimant's assertion that he is considered disabled by the Social Security Administration, or the basis for any award of disability.

36. A preponderance of the evidence establishes that WSI identified the correct rehabilitation option for Claimant, and that such option will give Claimant a reasonable opportunity for substantial gainful employment.

[¶ 24] In affirming WSI's June 2006 order, the ALJ made the following conclusions of law:

1. Claimant met his initial burden of proving by a preponderance of the evidence that he suffered a compensable [injury] and was entitled to worker's compensation benefits. Claimant proved by a preponderance of the evidence that the medical condition for which he sought benefits was causally related to the work injury.

2. Claimant was eligible for rehabilitation services from WSI pursuant to 65–05.1, NDCC. WSI provided those services and determined, as did the vocational consultant, that the first appropriate rehabilitation option was "return to same occupation, any employer" (NDCC 65–0[5].1–01(4)(b)). Since this option would return Claimant to the same occupation, apparently at the same income, giving Claimant a reasonable opportunity for substantial gainful employment, the income test is met.

3. Claimant has agreed he could perform the job of an electrician.

4. The bare allegation that Claimant is receiving social security disability and is considered disabled by the Social Security Administration, absent more relevant information and supporting medical evidence, is not sufficient to affect the determination of whether WSI selected the most appropriate rehabilitation option.

[¶ 25] The ALJ's decision, adopted as WSI's final order, concluded that WSI met its burden to show the vocational rehabilitation option chosen for Shotbolt was correct and established Shotbolt was capable of returning to work as an electrician. WSI's final order affirmed the June 1, 2006 order and concluded that Shotbolt was not entitled to receive disability benefits after June 5, 2006, stating, "Absent a

significant change in [Shotbolt's] compensable medical condition and proof of wage loss caused by that significant change, further disability and vocational rehabilitation benefits are denied."

## IV

[¶ 26] Shotbolt sets forth a number of factual assertions in support of his argument that WSI's factual findings are not supported by the greater weight of the evidence. WSI, on the other hand, maintains the record contains substantial evidence from which WSI could have reasonably concluded the rehabilitation plan would return Shotbolt to substantial gainful employment which was reasonably attainable in light of his injury and which would substantially rehabilitate his earning capacity.

[¶ 27] Shotbolt asserts that Dr. McMaster, as his treating doctor, had treated him both before and after his injury and was in the best position to evaluate the effects of his injury. Shotbolt asserts that Dr. McMaster's opinion is substantiated by an FCA, the EMG, and Dr. Joseph Hornyak's medical opinion, in addition to Shotbolt's own testimony. Shotbolt contends that WSI's rejection of Dr. McMaster's opinion, in favor of Dr. Linard's and Dr. Peterson's opinions, was done in an unreasoning manner—i.e., going more to the volume or length, rather than the depth and detail, of the opinion. In essence, Shotbolt argues that WSI should have given Dr. McMaster's medical opinions greater weight and credibility.

[¶ 28] This Court has consistently refused to create a presumption that a treating physician's opinion is entitled to greater weight than those of other examining physicians. *See Swenson v. Workforce Safety & Ins. Fund,* 2007 ND 149, ¶ 27, 738 N.W.2d 892. WSI must, however, weigh any conflicts in medical evidence

and adequately explain its reasons for rejecting evidence favorable to a claimant. *See Thomas v. Workforce Safety & Ins.,* 2005 ND 52, ¶ 9, 692 N.W.2d 901; *Barnes v. Workforce Safety & Ins.,* 2003 ND 141, ¶ 20, 668 N.W.2d 290; *see also* N.D.C.C. § 28–32–46(7). In *Huwe v. Workforce Safety & Ins.,* 2008 ND 47, ¶ 10, 746 N.W.2d 158 (citations omitted), this Court explained:

> WSI has the responsibility to weigh the credibility of medical evidence and resolve conflicting medical opinions. When confronted with a classic "battle of the experts," a fact-finder may rely upon either party's expert witness. Although WSI may resolve conflicts between medical opinions, the authority to reject medical evidence selectively does not permit WSI to pick and choose in an unreasoned manner. WSI must consider the entire record, clarify inconsistencies, and adequately explain its reasons for disregarding medical evidence favorable to the claimant.

" 'Objective medical evidence' may include 'a physician's medical opinion based on an examination, a patient's medical history, and the physician's education and experience.' " *Myhre v. North Dakota Workers Comp. Bur.,* 2002 ND 186, ¶ 15, 653 N.W.2d 705 (quoting *Engebretson v. North Dakota Workers Comp. Bur.,* 1999 ND 112, ¶ 24, 595 N.W.2d 312 (Maring, J., concurring)). WSI weighs the credibility of medical evidence and resolves conflicting medical opinions, and this Court will not re-weigh the evidence on appeal. *See Thompson v. Workforce Safety & Ins.,* 2006 ND 69, ¶ 11, 712 N.W.2d 309.

[¶ 29] Here, the ALJ found that Dr. McMaster, an internal medicine specialist, lacked the background or knowledge to credibly ascertain Shotbolt's ability to return to work as an electrician. In giving greater weight and credibility to Dr. Pe-

terson's opinions, the ALJ reasoned that his opinions were arrived at after review of Shotbolt's medical records and that his specialization in physical medicine and rehabilitation gave him greater credibility. The ALJ found Dr. Peterson provided a complete and detailed analysis of Shotbolt's medical situation and had showed objective medical evidence supporting his opinions.

[¶ 30] Shotbolt asserts he has never fully recovered from his workplace injury and, despite his surgery and physical therapy, no longer has the physical strength to work either as an industrial or commercial electrician. Shotbolt acknowledged in his testimony before the ALJ that he would be able to perform the physical demands of a residential electrician, but contends he has never worked in that job and lacks the skills to be competitively employable, i.e., to obtain "substantial gainful employment." Shotbolt essentially contends there is no evidence that he would be able to obtain substantial gainful employment as a "residential electrician," because it is a field in which he has never worked. However, there is evidence which supports WSI's finding that Shotbolt was able to return to work as an electrician.

[¶ 31] In asserting that he can no longer work as an electrician, Shotbolt seeks to differentiate between an industrial electrician, a commercial electrician, and a residential electrician. Shotbolt claims he does not have the physical strength to work as an industrial or commercial electrician and further claims he is unqualified to work as a residential electrician. As previously indicated, Dr. Linard, Shotbolt's treating orthopedic surgeon, gave Shotbolt a full work release on May 5, 2006, and Dr. Peterson opined that Shotbolt's work injury would not significantly limit Shotbolt's ability to perform duties as an electrician.

[¶ 32] WSI correctly observes that Dr. Peterson's opinion was based on the job demands for the position of an "Electrician: Journeyman/Apprentice," as provided in the "Functional Job Analysis," that Dr. Peterson reviewed in forming his opinions, in addition to reviewing Shotbolt's medical records and the FCA results. The functional job analysis defined the job objective as: "Installs cable tray, conduit, wiring, fixtures, switch gears, electrical control panels and associated devices for commercial and industrial construction." Shotbolt asserted that he had not worked as an electrician since December 2005. However, Shotbolt testified that he had started as an apprentice electrician in 1969, became a journeyman electrician in 1973, and although he had not previously done residential electrician work, he testified he could do it and was licensed to do it. We believe there is substantial evidence from which a reasoning mind could reasonably conclude Shotbolt had the capacity to work as an electrician.

[¶ 33] Shotbolt also contends that WSI failed to consider Shotbolt's pre-existing medical conditions in selecting the appropriate vocational rehabilitation option and that he is disabled "as confirmed by the Social Security Administration." Although Shotbolt's past medical history indicates some pre-existing conditions, including Reiter's syndrome, a brain aneurysm, and an aortic aneurysm, WSI argues there was no evidence that any of these conditions imposed functional limitations on Shotbolt at the time of the work injury to his left bicep. The medical evidence from Dr. Hornyak indicates that Shotbolt had pain and cramping of his left leg after surgical repair of the aortic and iliac aneurysm in October 2006.

[¶ 34] Shotbolt's work injury was in December 2005, Dr. Linard gave Shotbolt a full work release in May 2006, and WSI

issued the order selecting the most appropriate rehabilitation option in June 2006. WSI argues that even if Shotbolt's leg cramping constitutes a disabling condition, WSI has no obligation to consider functional limitations caused by non-work related injuries arising after the work injury resolved itself. *See Bjerke v. North Dakota Workers Comp. Bur.*, 1999 ND 180, ¶¶ 21–22, 599 N.W.2d 329 (discussing *Holtz v. North Dakota Workers Comp. Bur.*, 479 N.W.2d 469, 470–71 (N.D.1992), and holding the Bureau properly concluded, " '[to] be compensable, "an injury causing disability must be work-related, that is, within the course of employment" ' and '[o]nce [the claimant's] work-related disability resolved itself, however, the Bureau was under no further obligation to provide [the claimant] disability and rehabilitation benefits.' ").

[¶ 35] The record reflects that Dr. Peterson acknowledged Shotbolt's other medical conditions in reaching his medical opinion, including Shotbolt's left leg pain, symptoms of claudication, back pain, Reiter's syndrome, and history of abdominal aneurysm repair. Dr. Peterson also acknowledged that Shotbolt has some "minor decrease" in his arm flexion strength in his non-dominant, left arm. Nonetheless, Dr. Peterson's opinion to a reasonable degree of medical certainty was that "Shotbolt's left distal bicep tendon injury result[ed] in no significant limitation in his described work activities" and his loss of strength in his non-dominant arm "represents no significant impairment in his duties as an electrician."

[¶ 36] Further, as previously stated, the ALJ recognized a lack of evidence supporting a purported Social Security disability award. The ALJ found:

> There seems to have been adequate time for Claimant to have secured and presented here adequate evidence, including any applicable medical evidence, that related to any proceeding before the Social Security Administration and the basis for any finding of disability. Such evidence would have been relevant, as in determining the appropriate rehabilitation option, WSI must consider more than just the work injury; it must consider any other conditions that exist.

The ALJ concluded that it could not consider evidence not properly before it.

[¶ 37] WSI adopted the ALJ's conclusion that the appropriate vocational rehabilitation option for Shotbolt under N.D.C.C. § 65–05.1–01(4) was "return to same occupation, any employer." There is evidence in the record from which WSI could have reasonably reached this conclusion. We conclude that a reasoning mind reasonably could have determined the factual conclusions reached by WSI were proved by the greater weight of the evidence in the record, that a reasoning mind could have reasonably concluded the vocational rehabilitation plan would return Shotbolt to substantial gainful employment which was reasonably attainable in light of his injury and which would substantially rehabilitate his earning capacity, and that WSI adequately explained its reasons for disregarding medical evidence favorable to Shotbolt.

## V

[¶ 38] We have considered the remaining arguments raised by Shotbolt and determine they are either unnecessary to our decision or without merit. The district court judgment affirming WSI's final order is affirmed.

[¶ 39] GERALD W. VANDE WALLE, C.J., STEVEN L. MARQUART, D.J., DANIEL J. CROTHERS, and CAROL RONNING KAPSNER, JJ., concur.

[¶ 40] The Honorable STEVEN L. MARQUART, D.J., sitting in place of SANDSTROM, J., disqualified.