Filed 10/23/12 by Clerk of Supreme Court

IN THE SUPREME COURT

STATE OF NORTH DAKOTA

2012 ND 217

Collette Bishop, Appellant

v.

North Dakota Workforce Safety 

and Insurance, Appellee

         and

4 K’s Transportation, LLC,                                                                       Respondent

No. 20120138

Appeal from the District Court of Burleigh County, South Central Judicial District, the Honorable Cynthia M. Feland, Judge.

AFFIRMED.

Opinion of the Court by Crothers, Justice.

Stephen D. Little, 2718 Gateway Avenue, Suite 302, Bismarck, N.D. 58503-

0585, for appellant.

Shanon M. Gregor, Special Assistant Attorney General, P.O. Box 2626, Fargo, N.D. 58108-2626, for appellee.

Bishop v. WSI

No. 20120138

Crothers Justice.

[¶1] Collette Bishop appealed from a district court judgment affirming an order of an administrative law judge (“ALJ”) which affirmed an order of Workforce Safety and Insurance (“WSI”) denying further vocational rehabilitation benefits and temporary total disability benefits to Bishop.  We affirm, concluding the ALJ’s finding that Bishop was capable of performing the return-to-work options identified in her vocational rehabilitation plan was supported by a preponderance of the evidence.

I

[¶2] Bishop sustained work-related injuries in 2004 and 2008 while employed as  a truck driver.  As a result, she suffered physical and psychological injuries, including depression, anxiety, memory loss, post-traumatic stress disorder and impulse control disorder.  Following the 2008 injury, WSI paid Bishop medical benefits, vocational rehabilitation benefits and temporary total disability benefits.  Bishop briefly returned to work driving truck, but suffered increased physical difficulties and was taken off work by her doctor.  Bishop subsequently returned to work with her pre-injury employer in a temporary position doing office work up to four hours per day.  No evidence existed that Bishop’s psychological impairments affected her ability to perform the office work.

[¶3] In May 2009, WSI referred Bishop to Corvel Corporation for vocational rehabilitation services.  In December 2009, Bishop completed a functional capacity evaluation (“FCE”), showing she was physically capable of performing full-time light duty work.  Bishop’s physical therapist completed a “job match” based on the FCE and identified various positions Bishop could perform, and the vocational consultant selected dispatcher, customer service representative and information clerk/receptionist as appropriate return-to-work options for Bishop.

[¶4] Based upon the consultant’s report concluding Bishop was capable of returning to full-time employment in a light-duty position, WSI issued a notice of intention to discontinue benefits to Bishop on June 6, 2010.  On August 13, 2010, WSI issued its order denying further vocational rehabilitation benefits or disability benefits.  Bishop requested a formal hearing, alleging WSI failed to properly consider her cognitive and psychological limitations when it approved the return-to-work options.  After a hearing, an independent ALJ issued final findings of fact, conclusions of law and order affirming WSI’s order terminating benefits.  Bishop appealed to the district court, which affirmed the ALJ’s order.  

II

[¶5] Courts exercise limited appellate review of decisions of an administrative agency under the Administrative Agencies Practice Act, N.D.C.C. ch. 28-32.  
Sloan v. North Dakota Workforce Safety & Ins.
, 2011 ND 194, ¶ 4, 804 N.W.2d 184; 
Workforce Safety & Ins. v. Auck
, 2010 ND 126, ¶ 8, 785 N.W.2d 186.  Under N.D.C.C. §§ 28-32-46 and 28-32-49, the district court and this Court must affirm an order of an administrative agency unless:

“1. The order is not in accordance with the law.

2. The order is in violation of the constitutional rights of the appellant.

3. The provisions of this chapter have not been complied with in the proceedings before the agency.

4. The rules or procedure of the agency have not afforded the appellant a fair hearing.

5. The findings of fact made by the agency are not supported by a preponderance of the evidence.

6. The conclusions of law and order of the agency are not supported by its findings of fact.

7. The findings of fact made by the agency do not sufficiently address the evidence presented to the agency by the appellant.

8. The conclusions of law and order of the agency do not sufficiently explain the agency’s rationale for not adopting any contrary recommendations by a hearing officer or an administrative law judge.”

N.D.C.C. § 28-32-46.

[¶6] When an independent ALJ issues final findings of fact, conclusions of law and order under N.D.C.C. § 65-02-22.1, courts apply the same deferential standard of review to the ALJ’s factual findings as used for agency decisions.  
Sloan
, 2011 ND 194, ¶ 5, 804 N.W.2d 184; 
Auck
, 2010 ND 126, ¶ 9, 785 N.W.2d 186.  Recognizing the ALJ had “the opportunity to observe witnesses and the ‘responsibility to assess the credibility of witnesses and resolve conflicts in the evidence,’” in reviewing the ALJ’s findings of fact we do not make independent findings or substitute our judgment for that of the ALJ, but determine only whether a reasoning mind reasonably could have determined the findings were proven by the weight of the evidence from the entire record.  
Auck
, at ¶ 9 (quoting 
In re Juran & Moody, Inc.
, 2000 ND 136, ¶ 24, 613 N.W.2d 503); 
see also
 
Sloan
, at ¶ 5.  We do not, however, give deference to an independent ALJ’s legal conclusions, and questions of law are fully reviewable on appeal.  
Sloan
, at ¶ 5; 
Auck
, at ¶ 9.

III

[¶7] The dispositive issue on appeal is whether the ALJ’s finding that Bishop was capable of performing the jobs identified in her vocational rehabilitation plan was supported by a preponderance of the evidence.  Bishop contends the ALJ failed to properly consider her psychological impairments and WSI was required to present an expert medical opinion from a treating physician expressly stating that the identified return-to-work options were appropriate in light of her mental impairments.

[¶8] Vocational rehabilitation for injured workers is governed by N.D.C.C. ch. 65-

05.1, and the purpose of those services is to return the injured worker to gainful employment:

“It is the goal of vocational rehabilitation to return the disabled employee to substantial gainful employment with a minimum of retraining, as soon as possible after an injury occurs.  ‘Substantial gainful employment’ means bona fide work, for remuneration, which is reasonably attainable in light of the individual’s injury, functional capacities, education, previous occupation, experience, and transferable skills . . . .”

N.D.C.C. § 65-05.1-01(3).  A rehabilitation plan is appropriate if it meets the requirements of N.D.C.C. ch. 65-05.1 and gives the injured worker a reasonable opportunity to obtain substantial gainful employment.  
Shotbolt v. North Dakota Workforce Safety & Ins.
, 2010 ND 13, ¶ 19, 777 N.W.2d 853; 
Genter v. Workforce Safety & Ins. Fund
, 2006 ND 237, ¶ 14, 724 N.W.2d 132.  WSI has the burden “to establish that a vocational rehabilitation plan is appropriate.”  
Shotbolt
, at ¶ 20; 
Genter
, at ¶ 14.  “Under this Court’s standard of review, WSI’s selection of a vocational rehabilitation plan will not be reversed when there is ‘evidence from which a reasoning mind could have reasonably concluded that the rehabilitation plan would return [the injured worker] to substantial gainful employment which was reasonably attainable in light of his injury and which would substantially rehabilitate his earning capacity.’”  
Shotbolt
, at ¶ 21 (quoting 
Thompson v. North Dakota Workers’ Comp. Bureau
, 490 N.W.2d 248, 255 (N.D. 1992)).  

[¶9] The legislature intended for injured workers to be provided with actual rehabilitation, with a realistic opportunity to return to work, and not merely a theoretical rehabilitation on paper.  
Shotbolt
, 2010 ND 13, ¶ 19, 777 N.W.2d 853; 
Genter
, 2006 ND 237, ¶ 14, 724 N.W.2d 132; 
Svedberg v. North Dakota Workers Comp. Bureau
, 1999 ND 181, ¶ 17, 599 N.W.2d 323.  WSI therefore must consider all of the claimant’s functional limitations when determining whether the employment options identified in the rehabilitation plan present a realistic opportunity for substantial gainful employment.  
See
 
Shotbolt
, at ¶ 20; 
Genter
, at ¶ 14; 
Svedberg
, at ¶ 17.  As this Court explained in 
Svedberg
:

“If [WSI], the consultant, the medical assessment team, and the treating physician assess the claimant as a hypothetical ‘perfect’ individual with only the current work-related disability, and do not take the worker’s actual whole-person functional capacities into account, any vocational rehabilitation plan based upon that assessment will be flawed and unworkable.  When the work-related injury makes return to the same job or occupation impossible, and the focus of rehabilitation turns to transferable skills and other occupations, common sense dictates that the worker’s actual functional abilities must be considered if the vocational rehabilitation plan is to be meaningful.”

Svedberg
, at ¶ 17.  

[¶10] Bishop’s vocational rehabilitation plan determined that returning to work in the local job pool in a position suited to her education, experience and job skills was the appropriate rehabilitation option under N.D.C.C. § 65-05.1-01(4) and identified dispatcher, customer service representative and information clerk/receptionist as viable job options.  Bishop claims, however, that her psychological impairments affect her ability to work with the public and that WSI failed to ask any of her treating physicians whether she was capable of performing those positions in light of her mental impairments. 

[¶11] In determining whether the vocational rehabilitation plan was appropriate and provided a realistic opportunity for substantial gainful employment, the ALJ provided detailed and exhaustive findings of fact addressing Bishop’s arguments and chronicling her psychological history and treatment before and after the work injuries.  The ALJ thoroughly documented Bishop’s psychological impairments through medical notes and records, correspondence from her treating medical professionals, observations of persons who were in contact with Bishop during the rehabilitation process and evidence about Bishop’s employment experiences after her 2008 injury.  [¶12] Contrary to Bishop’s claim that WSI failed to present an expert medical opinion from any of her treating physicians expressly approving the identified job options in light of her mental impairments, the ALJ found Dr. Arazi, Bishop’s treating neurologist, was aware of her psychological impairments and treatments and approved the identified return-to-work options:

“Dr. Arazi, a neurologist, was Ms. Bishop’s treating physician addressing her head injuries.  He first saw her on November 3, 2008, on referral from Ms. Bishop’s family practice physician, Dr. Anthony Johnson. Dr. Johnson’s medical records make it clear that he was deferring to Dr. Arazi with regard to Ms. Bishop’s head injuries and ability to work.  On December 11, 2008, Dr. Johnson noted that he was relying on ‘the help of Dr. Brown and Dr. Arazi to determine when she can get back to full-time work if at all.’  Nora Allen, FNP, noted on July 3, 2009, that Dr. Arazi ‘is in charge of her C3.’  Dr. Arazi saw Ms. Bishop from November, 2008 until August, 2009.  He detailed Ms. Bishop’s work injuries, her medical, social, family, surgical and medication history.  He noted her neuropsychiatry status and performed neurological exams.  He directed her care, including diagnostic testing and treatment.  He ordered physical therapy and addressed her work status.  On January 25, 2010, Dr. Arazi concurred in the FCE and the identified jobs.  Dr. Arazi, a neurologist who treated Ms. Bishop for nearly a year following her injury is fully qualified to provide an opinion regarding Ms. Bishop’s ability to work.  That opinion, along with the medical records and in conjunction with Dr. M.C. Brown’s neuropsychological testing and Dr. Haynes’ medical records and reports to WSI that Ms. Bishop’s impulse control disorder is stable, was sufficient for Corvel to determine Ms. Bishop’s limitations and supports a conclusion that Ms. Bishop’s head injuries do not preclude her from performing the identified occupations.” 

Bishop cites no authority suggesting a medical professional must use specific “magic words” or expressly identify which of the claimant’s injuries, impairments or conditions have been taken into account when approving identified return-to-work options.  The record demonstrates Dr. Arazi, Bishop’s treating neurologist, was fully aware of her cognitive and mental impairments and expressly approved the “job match comparison,” which included the return-to-work options in the vocational rehabilitation plan.  

[¶13] The ALJ also relied upon other evidence to find Bishop was capable of performing the identified job options.  The ALJ made lengthy findings documenting Bishop’s successful treatment with medications for her impulse control disorder, expressly noting that Dr. Haynes, Bishop’s treating psychiatrist, advised WSI by letter that Bishop’s impulse control disorder was stabilized on her current medications.  The ALJ ultimately found:

“The greater weight of the evidence shows that WSI did take Ms. Bishop’s closed head injuries into account when developing and approving the employment options in her vocational rehabilitation plan.  Based on the evidence before it, including medical records from Drs. Brown, Arazi, and Haynes, and therapist Sharon Brown, Corvel was able to assess the limitations, if any, imposed by Ms. Bishop’s closed head injuries.  Corvel consultant Kelly Kraus testified that Ms. Bishop always presented herself well.  Further, the evidence shows that Ms. Bishop was always appropriate with others throughout the course of her medical treatment, vocational training (including computer classes), and vocational plan development.  She also worked for a number of years with a diagnosis of impulse control disorder and she returned to part-time transitional work with her pre-injury employer and there was no evidence that she was unable to work because of her closed head injuries.  Kelly Kraus reviewed the medical records and found no red flags; Ms. Bishop’s impulse control was stable and she has functional average intelligence.  Ms. Bishop’s cognitive abilities may not be what they once were, but they are sufficient to allow her to perform the identified jobs.”   

[¶14] We will not reverse WSI’s selection of a vocational rehabilitation plan if evidence exists from which a reasoning mind could reasonably conclude the rehabilitation plan would return the injured worker to substantial gainful employment which reasonably is attainable in light of her injury.  
Shotbolt
, 2010 ND 13, ¶ 21, 777 N.W.2d 853.  Based upon the evidence in this record, including Dr. Arazi’s explicit approval of the identified job options, the medical notes and records, the observations  of persons involved in the rehabilitation process and evidence of Bishop’s post-injury employment experience, we conclude the ALJ’s finding that Bishop was capable of performing the return-to-work options in her vocational rehabilitation plan was supported by a preponderance of the evidence.

IV

[¶15] We have considered the remaining issues and arguments raised by the parties and find them to be either unnecessary to our decision or without merit.  The judgment affirming the ALJ’s order is affirmed.

[¶16] Daniel J. Crothers

Dale V. Sandstrom

Carol Ronning Kapsner

Gerald W. VandeWalle, C.J.

Maring, Justice, dissenting.

[¶17] I, respectfully, dissent.  Based on a review of this record, a reasoning mind could not have reasonably concluded that the rehabilitation plan would return Bishop to substantial gainful employment, which was reasonably attainable in light of her work-related injuries and her functional limitations resulting from those injuries.

[¶18] Under N.D.C.C. § 65-05.1-01, the purpose of rehabilitation services is clearly expressed:

1. The state of North Dakota exercising its police and sovereign powers declares that 
disability caused by injuries in the course of employment
 and disease fairly traceable to the employment 
create a burden upon the health and general welfare of the citizens of this state and upon the prosperity of this state and its citizens
.

2. The 
purpose of this chapter is to ensure that injured employees
 covered by this title 
receive services
, so far as possible, necessary to assist the employee and the employee’s family in the adjustments required by the injury 
to the end that the employee receives comprehensive rehabilitation services
, including medical, psychological, economic, and social rehabilitation.  (Emphasis added.)

 The “goal” of vocational rehabilitation under N.D.C.C. § 65-05.1-01(3), is “to return the disabled employee to substantial gainful employment with a minimum of retraining, as soon as possible after an injury occurs.”  Under the statute, “substantial gainful employment” means “bona fide work, . . . which is reasonably attainable 
in light of the individual’s injury, functional capacities
, education, previous occupation, experience, and transferable skills, . . .”  
Id.
 (emphasis added).  WSI initiated vocational rehabilitation services for Bishop under N.D.C.C. ch. 65-05.1 and hired CorVel Corporation as a vocational consultant to prepare a report that identified what employment options are most appropriate for Bishop based on her functional capacities and transferrable skills.  The burden to establish that a vocational rehabilitation plan is appropriate is on WSI.  
Shotbolt v. N.D. Workforce Safety and Ins.
, 2010 ND 13, ¶ 20, 777 N.W.2d 853.  The dispositive issue in this case is whether WSI’s vocational rehabilitation plan was appropriate under N.D.C.C. § 65-

05.1-01.  It is well-settled that WSI must take into account not only functional limitations caused by the work injuries, but also a claimant’s preexisting functional limitations when determining whether an employment option presents a realistic opportunity to return to work.  
Shotbolt
, 2010 ND 13, ¶ 20, 777 N.W.2d 853; 
Genter v. Workforce Safety & Ins. Fund
, 2006 ND 237, ¶ 14, 724 N.W.2d 132; 
Svedberg v. N.D. Workers Comp. Bureau
, 1999 ND 181, ¶ 17, 599 N.W.2d 323.

[¶19] On September 30, 2008, when Bishop fell fourteen feet from the top of her truck as she was strapping down a load, she sustained a work injury to her head, cervical, and lumbar spine.  At the time of these injuries, she was suffering from posttraumatic stress disorder and impulse control disorder.  As a result of her work injuries on September 30, 2008, she suffered depression, anxiety, headaches, blurring of vision, short-term memory loss and pain in her neck, shoulders, back, hip, and torso which were diagnosed as myofascial pain syndrome.  Dr. Haynes, a psychiatrist with Medcenter One Health Systems, has treated Bishop since 2004 approximately.  Dr. Haynes’ medical record note dated January 20, 2010, states:

I believe that her impulse control problems, irritability and mood shifts are related to her postconcussion syndrome and that this syndrome is related to both her closed head injuries; the first in 2004, then another in 2008.

. . . 

I believe her most recent episodes of depression have been related to her on-the-job injuries.

On December 16, 2010, ALJ Seaworth found Bishop’s depression and anxiety were caused by her work injuries and ordered that Bishop was entitled to benefits.  WSI did not appeal that order.   

[¶20] On June 24, 2009, Bishop saw Dr. Brown, a psychologist with Medcenter One Health Systems on a referral by Dr. Haynes, for a neuropsychological evaluation of Bishop’s current cognitive and intellectual functioning.  The results of Dr. Brown’s neuropsychological evaluation indicated:

[S]he is functioning in the overall Average range of intelligence.  However, 
persistent impairment was noted on tasks of verbal fluency, mental tracking, visual analysis, and capacity to inhibit a competitive cognitive response set
.  Overall, the current findings are very consistent with past data by indicating 
persistent frontal lobe dysfunction, with greater right hemisphere brain involvement
.

Certainly, Mrs. Bishop devoted a sincere and consistent effort to her performance during this cognitive evaluation.  Clearly, 
her cognitive deficits are a result of the series of her head injuries
.  (Emphasis added.) 

Despite Bishop’s well-documented cognitive deficits, WSI never inquired of any physician or Dr. Brown whether Bishop’s cognitive deficits impaired her ability to perform the jobs identified in the rehabilitation plan or even generally whether her cognitive deficits impaired her ability to work.  The vocational consultant from CorVel Corporation testified she never asked Dr. Haynes or Sharon Brown, Bishop’s counselor, if Bishop was mentally capable of performing the jobs she identified in the rehabilitation plan.  The attorney for WSI admitted during oral argument that Dr. Arazi was never asked about the impact of Bishop’s mental and cognitive limitations on her capacity to do the jobs identified.  The vocational consultant testified she concluded Bishop was mentally capable of performing the jobs identified because Bishop was functioning in the average range of intelligence according to the neuropsychological testing done by Dr. Brown and Bishop’s impulse control had stabilized.  The vocational rehabilitation consultant apparently ignored the other findings in the neuropsychological evaluation setting out Bishop’s significant cognitive deficits.  The vocational consultant must assess the worker’s job options in  light of the worker’s restrictions and limitations.  
Svedberg
, 1999 ND 181, ¶ 15, 599 N.W.3d 323.  

[¶21] Any reliance on the responses to questions posed by the vocational consultant to Dr. Arazi, a neurologist, to fill this gap in the evidence is misplaced.  The record is clear that a physical therapist was hired by WSI to perform a functional capacities evaluation.  That evaluation assessed Bishop’s physical limitations resulting from her physical impairments.  The results placed Bishop in the light level of work, demonstrated she could lift 25 pounds occasionally and carry up to 20 pounds occasionally, demonstrated crawling, crouching, and stepladder climbing were not recommended and “sitting is frequent with occasional standing and walking.”  Dr. Arazi was provided the results of the functional capacities evaluation and the job match comparison and asked the following questions to which he gave his responses by check marks:

1. Do you concur with the FCE results?

__X__ yes ____ no

2. Do you concur with the job match comparison completed by Mr. Churchill, PT?

__X__ yes ____ no

Dr. Arazi was only responding to whether he agreed with the physical limitations found by the physical therapist and that the jobs identified were within Bishop’s physical limitations.

[¶22] WSI failed to consider the impact of Bishop’s cognitive deficits and psychological limitations when it approved her return to work options.  A reasoning mind could not reasonably conclude that Bishop could return to work as a dispatcher, customer service representative, information clerk or receptionist because the rehabilitation plan failed to take into consideration all of Bishop’s documented cognitive deficits and psychological limitations.  WSI has failed in its burden of proof that this vocational rehabilitation plan is reasonable under N.D.C.C. § 65-05.1-01.

[¶23] I would reverse the judgment affirming WSI’s order and remand for reinstatement of Bishop’s disability and rehabilitation benefits. 

[¶24] Mary Muehlen Maring