1999 ND 180

**Judy BJERKE, Claimant and Appellant,**

v.

**NORTH DAKOTA WORKERS COMPENSATION BUREAU, Appellee,**

and

**Imation, Respondent.**

No. 980381.

Supreme Court of North Dakota.

Sept. 8, 1999.

Mark G. Schneider, Schneider, Schneider & Phillips, Fargo, N.D., for claimant and appellant.

Leo F. J Wilking, Special Assistant Attorney General, Fargo, N.D., for appellee.

SANDSTROM, Justice.

[¶ 1] Judy Bjerke appealed from a district court judgment affirming a North Dakota Workers Compensation Bureau order denying further disability benefits. We affirm in part, concluding an injury causing disability is compensable only if occurring within the course of employment, reverse in part, concluding the Bureau's improper notice of intention to terminate benefits requires reinstatement of benefits, and we remand.

I

[¶ 2] On June 8, 1993, Bjerke had back surgery for spondylolisthesis,[1] performed by Dr. Humphrey. Bjerke's back condition was a birth defect she had known about for over 20 years. On December 1, 1993, Bjerke applied for workers compensation benefits for work-connected repetitive-motion injuries to her wrists and hands. Dr. Opgrande performed a right carpal tunnel release on Bjerke on November 17, 1994, and a left carpal tunnel release on May 4, 1995.

[¶ 3] On August 16, 1995, a hearing was held before Administrative Law Judge Gregory B. Gullickson. Gullickson concluded Bjerke was " 'temporarily disabled' because of inflammation due to the screws implanted by back surgery.... However, at that time, ... [Bjerke] was already disabled as a result of the bilateral carpal tunnel." Gullickson recommended the Bureau order Bjerke "is entitled to temporary total disability benefits from and after March 14, 1994 and ongoing until such time as there is competent medical and vocational evidence demonstrating that she is once again employable within the meaning of the North Dakota Workers Compensation Act." The Bureau adopted Gullickson's recommended order.

[¶ 4] On September 10, 1996, the Bureau sent Bjerke a notice of intention to discon-

---

1. Spondylolisthesis is "forward displacement of one vertebra over another, usually of the fifth lumbar over the body of the sacrum, or of the fourth lumbar over the fifth." Richard Sloane, *The Sloane–Dorland Annotated Medical–Legal Dictionary* 661 (1987).

tinue temporary total disability benefits, effective October 1, 1996, because Dr. Opgrande released Bjerke to return to work, Bjerke's employer had available a light housekeeping position approved by Dr. Opgrande, and Bjerke failed to contact her employer to arrange a date to return to work. By letter of September 20, 1996, Bjerke's attorney advised the Bureau:

The claims analyst, the rehabilitation specialist, and, we assume, the Bureau is well aware that Ms. Bjerke's work-related hand condition notwithstanding, she is disabled because of her back condition. In fact, Dr. Turner in his most recent letter of September 13, 1996 states that Ms. Bjerke is to "continue off work until [her] evaluation for surgery." See copy enclosed.

Also, for the record, Ms. Bjerke did *not*, in any regard, refuse the job offer offered by 3M. Rather, she simply states that given her disabling back condition and the permanent limitations imposed by her bilateral upper extremity work injuries, she cannot do the job.

[¶ 5] On October 11, 1996, the Bureau sent Bjerke a notice of intention to discontinue temporary total disability benefits under N.D.C.C. § 65–05–08.1(6), because Bjerke had been released to return to employment by Dr. Opgrande; Bjerke's employer had a light housekeeping position available within her restrictions, which had been approved by Dr. Opgrande; and Bjerke failed to make a good-faith effort to attempt to return to work in the modified position. On November 1, 1996, the Bureau issued an order in which it concluded:

Claimant has been released to return to work in a modified position as a housekeeper at Imation. The claimant's work injury does not limit her from performing this position, however, claimant's noncompensable low back condition limits her ability to perform this position.

The Bureau ordered: "absent a significant change in claimant's medical condition due to the work injury, additional disability benefits beyond November 1, 1996, are denied."

[¶ 6] Bjerke requested reconsideration. Temporary Administrative Law Judge Charles A. Stock specified the following issue: "Whether or not claimant, Judy Bjerke, is entitled to further disability benefits in connection with her work-related, bilateral upper extremity impairments." After a hearing on June 4, 1997, Stock found:

16. As of October 7, 1996, Ms. Bjerke had reached maximum medical improvement with respect to her work-related carpal tunnel syndrome problems, was released to work in a modified job position had been offered an appropriate job, but was permanently disabled and not able to return to work as a result of her non-work-related (noncompensable) back injury.

17. Bjerke is not currently disabled as a result of a work-related (compensable) injury.

Stock concluded:

2. Ms. Bjerke's current disability is unrelated to any work injury.

3. To be compensable, "an injury causing disability must be work-related, that is, within the course of employment ..." *Holtz v. N.D. Workers Compensation Bureau*, 479 N.W.2d 469, 471 (N.D. 1992).

4. When Bjerke was disabled as a result of a work-related injury (carpal tunnel) and separately disabled as a result of a non-work-related injury/medical condition (back problems), and the Bureau was therefore obligated to provide disability and rehabilitation benefits. Once Bjerke's work-related disability resolved itself, however, the Bureau was under no further obligation to provide Bjerke disability and rehabilitation benefits.

Stock recommended an order "that the Bureau's November 1, 1996, Order Discontinuing Disability Benefits effective November 1, 1996, be in all things affirmed."

[¶ 7] On July 30, 1997, the Bureau issued an order adopting Stock's recommended findings of fact, conclusions of law, and order as the Bureau's final order. Bjerke appealed to the district court. A district court judgment affirming the Bureau's July 30, 1997, order was entered, and Bjerke appealed to this Court.

[¶ 8] The district court had jurisdiction under N.D. Const. art. VI, § 8, and N.D.C.C. §§ 27–05–06, 28–32–15, and 65–10–01. Bjerke's appeal to this Court was timely under N.D.R.App.P. 4(a) and N.D.C.C. § 28–32–21. This Court has jurisdiction under N.D. Const. art. VI, §§ 2 and 6, and N.D.C.C. §§ 28–27–01 and 28–32–21.

## II

[¶ 9] We recently reiterated our limited review of administrative agency decisions:

In an appeal from a district court judgment entered on review of an administrative agency decision, we review the decision of the agency, rather than that of the district court. *Lang v. North Dakota Workers Comp. Bureau,* 1997 ND 133, ¶ 7, 566 N.W.2d 801. Under N.D.C.C. §§ 28–32–19 and 28–32–21, we affirm an administrative agency decision unless the agency's findings of fact are not supported by a preponderance of the evidence, the conclusions of law are not supported by the findings of fact, the decision is not supported by the conclusions of law, the decision is not in accordance with the law or violates the appellant's constitutional rights, or the agency's rules or procedures deprived the appellant of a fair hearing. *Sprunk v. North Dakota Workers Comp. Bureau,* 1998 ND 93, ¶ 4, 576 N.W.2d 861. In evaluating an administrative agency's findings of fact, we do not make independent findings or substitute our judgment for that of the agency, but determine only if a reasoning mind reasonably could have determined the findings were proven by the weight of the evidence from the entire

record. *Power Fuels, Inc. v. Elkin,* 283 N.W.2d 214, 220 (N.D.1979); *Hibl v. North Dakota Workers Comp. Bureau,* 1998 ND 198, ¶ 7, 586 N.W.2d 167.

*Vraa v. North Dakota Workers Comp. Bureau,* 1999 ND 6, ¶ 8, 588 N.W.2d 857.

## III

■ [¶ 10] Bjerke argues workers compensation statutes are to be liberally construed to avoid forfeiture and afford relief whenever possible. We have construed workers compensation statutes "liberally in favor of injured workers," *Sprunk v. North Dakota Workers Comp. Bureau,* 1998 ND 93, ¶ 5, 576 N.W.2d 861, and to "afford relief and avoid forfeiture," *Zueger v. North Dakota Workers Comp. Bureau,* 1998 ND 175, ¶ 12, 584 N.W.2d 530. As we noted in *Sprunk,* N.D.C.C. § 65–01–01 was amended in 1995 to provide, in part: " 'This title may not be construed liberally on behalf of any party to the action or claim.' 1995 N.D. Laws, Ch. 605, § 1." *Id.* at ¶ 5. However, "whether or not we construe a workers compensation statute liberally, under N.D.C.C. § 65–01–11, 'a claimant has the burden of proving he or she is entitled to participate in the workers compensation ·fund.' " *Id.* at ¶ 5 (quoting *Feist v. North Dakota Workers Comp. Bureau,* 1997 ND 177, ¶ 8, 569 N.W.2d 1).

## IV

■ [¶ 11] Bjerke contends "the Bureau attempted to 'disable' Bjerke by setting her up for failure" by requiring Bjerke's employer to "offer only 'full-time' work to Bjerke on August 30, 1996, knowing full well that she could not handle full-time employment because of the combination of her non-work-related back and work-related bilateral carpal tunnel injuries."

[¶ 12] Temporary Administrative Law Judge Stock found:

8. On August 30, 1996, Bjerke was offered a light housekeeping employment position with IMATION which was within the work restrictions, including work-hardening/workday tolerance re-

quirements and restrictions set forth in the WTA and placed by Dr. Opgrande. The job offer was made by way of a letter to Bjerke from Tischer, and Bjerke was asked to reply to the job offer by September 9, 1996. While the August 30, 1996 letter described the light housekeeping job offer as being "full-time" employment, Bjerke, Tischer, and Knudsen (Bjerke's Vocational Rehabilitation Consultant) were all aware that work-hardening (working less than full days to begin with) would be necessary.

The Bureau adopted ALJ Stock's finding. There is evidence in the record from which a reasoning mind could reasonably find, as the Bureau did, that the persons involved "were all aware that work-hardening (working less than full days to begin with) would be necessary."

[¶ 13] Bjerke argues it was the Bureau, not Marilee Tischer (the human resources manager for Bjerke's employer), Bjerke, or Sandra Knudsen (the rehabilitation consultant assigned to Bjerke's case), that required a job offer "only in 'full-time' terms." The evidence, however, does not undercut the Bureau's finding. Tischer testified:

> My intention was that eventually it would be a full-time job, so that's why it says full time. We do not have part-time jobs for employees that last forever, so my intention was to get her in and get her to a full-time position within a period of time.

Although the job offered was a "full-time" job, the evidence shows Bjerke's return to work would start with a work-hardening process involving less than full days.

## V

■ [¶ 14] Bjerke argues the Bureau acted in an impermissibly adversarial manner in adjudicating her claim and in terminating her benefits. We have repeatedly cautioned that the Bureau must not place itself in a full adversary position to the claimant. *Blanchard v. North Dakota*

*Workers Comp. Bureau*, 1997 ND 118, ¶ 23, 565 N.W.2d 485. The record evidence supports the Bureau's findings and does not demonstrate the Bureau assumed an inappropriate adversarial position.

[¶ 15] Bjerke had a work tolerance assessment on March 18, 1996. The assessment reported Bjerke "is currently functioning between the sedentary-light and light range of physical demand characteristics of work." The report assessed Bjerke's back and hand restrictions for lifting, pulling, pushing, grasping, bending, climbing, squatting, kneeling, walking, sitting, and standing separately, and recommended a work-hardening process for employment, which "would need to significantly follow these restrictions" and "allow her to start off very slowly in a work hardening phase and allow her to switch positions as much as possible."

[¶ 16] An April 8, 1996, treatment note by Dr. Pinto says: "From my standpoint, [Bjerke] can return to work . . . within the restrictions established by the FCA of March 18, 1996." On May 24, 1996, Dr. Opgrande reported Bjerke had "reached maximum medical improvement in regard to her hand injuries," and was "released to return to work." On August 20, 1996, Dr. Opgrande reported Bjerke could perform a housekeeping position, and commented it "would appear to be within capabilities as compared to work tolerance assessment. Should also receive an opinion from Dr. Pinto as well."

[¶ 17] By letter of August 30, 1996, Marilee Tischer, Human Resource Manager of Bjerke's employer, offered Bjerke a light housekeeping position "that meets your work restrictions set by Dr. Donald Opgrande," and asked Bjerke to "reply by September 9 to discuss a start date." On September 5, 1996, Dr. Turner, Bjerke's treating back physician, wrote on a prescription pad for Bjerke: "Not to consider Return to work. Presently being evaluated For Back Surgery," which Bjerke faxed to Tischer. On September 6, 1996, Bjerke

wrote Sandra Knudsen, a rehabilitation consultant assigned to Bjerke's file:

> I am not turning the job down, or I don't want to but I have to talk with Dr. Pinto.
>
> ....
>
> I have faxed [Marilee] Tischer a copy of Dr. Turner's note.... I am worried about the full time part because you have *not* gotten in touch with me on that. I thought I would go slow and work my way up. I know I could *never* start out 8 hr. days to begin with. I am interested in the job, but I don't know what I will be doing.

By letter of September 13, 1996, Dr. Turner advised Bjerke:

> This is a clarification on your restrictions. Since you are being evaluated for further fusion as well as hardware removal the restrictions should include no squatting, kneeling or bending. You are to continue off work until your evaluation for surgery.

On October 1, 1996, Dr. Pinto advised Dr. Turner he had reviewed Bjerke's discograms and reported:

> I have explained to her that the best thing at this point in time would be to try to avoid any surgical treatment and just continue with conservative care and modification of her duties. I doubt very much if this patient is able to work on an assembly line at 3M. I also believe it would be very hard for her actually to do any work as she requires constant changing of position and also because she has constant symptoms. I do not know if there would be a job at the sedentary level of duty on a part time basis for her.

On October 7, 1996, Dr. Turner wrote Bjerke: "Please use this correspondence as a letter to document your restrictions for return to work. Doctor Pinto's office did contact me and based on the content of their recommendations, it is my opinion that you are permanently disabled and will not be returning to work at Imations."

■ [¶ 18] Bjerke argues "Dr. Turner's conclusory two sentence 'permanently disabled' letter (App.131) ... does not comply with § 65–05–08.1, N.D.C.C." Section 65–05–08.1, N.D.C.C., provides procedures for verifying disability before benefits are terminated. It is intended to implement pre-termination protections and to prevent gaps in a claimant's medical record through updated medical reports about the duration of a claimant's disability. *Frohlich v. North Dakota Workers Comp. Bureau*, 556 N.W.2d 297, 302 (N.D.1996). Here, there were no gaps in Bjerke's medical record, and the Bureau had updated medical reports. Although Dr. Turner's letter reporting Bjerke was disabled was short, the Bureau was not "without adequate medical documentation." *Id.*

[¶ 19] Upon considering the evidence in the record, we conclude a reasoning mind could reasonably find, as the Bureau did, that Bjerke "was permanently disabled and not able to return to work as a result of her non-work-related (noncompensable) back injury," and "is not currently disabled as a result of a work-related (compensable) injury." Our review of the record in this case has not persuaded us the Bureau was impermissibly adversarial.

## VI

■ [¶ 20] Bjerke contends the Bureau misapprehended the concept of disability:

> Bjerke was never given the opportunity to return to part-time work within the specific restrictions of the WTA, as specifically outlined by her treating physician, Dr. Opgrande.
>
> ALJ Stock failed to distinguish between "partial" and "total" disability. This is crucial because if Bjerke is only "partially" disabled and could return to work (as outlined by Dr. Opgrande in the WTA), she nonetheless would have been entitled to "partial disability" benefits if she could not do work full-time....

The ALJ—and thus the Bureau—ultimately, therefore, "disabled" Bjerke by refusing to cooperate with Bjerke and the employer in fashioning part-time work for Bjerke within her physical restrictions.

However, Bjerke's employer offered her a "full-time" job, which it intended would start with a work-hardening process under which Bjerke would work less than full work days at first and increase later. Furthermore, the Bureau reasonably found Bjerke was "not able to return to work as a result of her non-work-related (noncompensable) back injury."

[¶ 21] Bjerke contends an employee who sustains a disabling work-connected injury which improves so she could return to work, but is unable to do so because of a non-work-connected disabling medical condition that manifested itself before the work-connected injury but did not become disabling until after the work-connected injury, is not precluded from receiving workers compensation benefits. Bjerke contends the Bureau misapplied our holding in *Holtz v. North Dakota Workers Comp. Bureau,* 479 N.W.2d 469 (N.D. 1992), which involved a claimant with physical limitations due to non-work-related injuries she suffered after her compensable work-related injury. Bjerke relies on the following language in *Holtz:*

> Reading "medical limitations" together with "injury," we believe the intent of the legislature was for the Bureau to consider an individual's medical limitations at the time that individual sustained a work-related injury. The proposition that an injury must be work-related, that is, within the course of employment, is evidenced throughout the workers' compensation law.

*Id.* at 470–71. Bjerke misreads *Holtz.* Under *Holtz,* to be eligible for workers compensation benefits, a claimant's "injury must be work-related, that is, within the

course of employment." *Id.* at 471. That requirement is clearly stated in the paragraph immediately following the language relied on by Bjerke:

> While all disease and disability diminishes the welfare and prosperity of the state and its people, it is only that disease and disability that is "caused by injuries in the course of employment and . . . fairly traceable to the employment," that the rehabilitation chapter of the Workers' Compensation Act addresses.

*Id.* The requirement of a connection between a claimant's work and eligibility for workers compensation benefits is further indicated in the following passage:

> These statutes clearly tell us that it is work-related injury that is at the center of the legislature's attention. Holtz' argument that an injured person should collect for nonwork-related injuries that occur after a work-related injury and with no causal connection to the work-related injury, and have those subsequent injuries considered in a rehabilitation assessment, flies in the face of the language of the workers' compensation statutes and the legislative intent and purpose conveyed by that language.

*Id.* Under *Holtz,* a disability due to a work-related injury qualifies a claimant for workers compensation benefits, while a disability due to a non-work-related injury or medical condition does not qualify a claimant for benefits.

[¶ 22] We conclude the Bureau, following *Holtz,* properly concluded, "[t]o be compensable, 'an injury causing disability must be work-related, that is, within the course of employment' " and "[o]nce Bjerke's work-related disability resolved itself, however, the Bureau was under no further obligation to provide Bjerke disability and rehabilitation benefits."[2]

---

**2.** At oral argument, Bureau's counsel conceded that, if Bjerke's back condition improves and no longer disables her from work-

ing, the Bureau will have to reinstate benefits and help her return to work.

## VII

■ [¶ 23] Relying on *Flink v. North Dakota Workers Comp. Bureau,* 1998 ND 11, ¶¶ 18, 19, 574 N.W.2d 784, Bjerke argues she is entitled to benefits because the Bureau gave an invalid reason for denying further benefits. We said in *Flink:*

> If the Bureau intended to reduce Flink's benefits, based upon his having been released to return to work, it should have clearly notified Flink by marking choice number two and naming the doctor, the date, and any medical evidence indicating Flink was ready to be or had been released to return to work.... Until proper notice is given, the fact the record discloses evidence Flink might have been released to return to work is irrelevant....
>
> Because the Bureau failed to properly address Flink's rehabilitation options and also failed to give Flink proper notice, "we hold that he is entitled to the benefits he seeks." *Beckler [v. North Dakota Workers Comp. Bureau,* 418 N.W.2d 770] at 775 [ (N.D.1988) ]. The Bureau's decision denying Flink temporary total disability benefits as of May 5, 1993, is reversed, and Flink is entitled to temporary total disability benefits retroactive to May 5, 1993, and prospectively until the Bureau adequately addresses Flink's rehabilitation options and provides proper notice of intention to discontinue or reduce benefits.

*Id.* at ¶¶ 18, 19.

[¶ 24] The Bureau's September 10, 1996, notice of intention to discontinue temporary total disability benefits erroneously said Bjerke had failed to contact her employer to arrange a date to return to work. The Bureau's October 11, 1996, notice of intention to discontinue temporary total disability benefits also failed to provide proper notice because it was not "sufficiently detailed to frame the precise issues, delineate the Bureau's theories and rationale for terminating benefits, and summarize the significant evidence supporting the Bureau's conclusions." *Stewart v. North Dakota Workers Comp. Bureau,* 1999 ND 174, ¶ 19. The Bureau's November 1, 1996, order provided the requisite notice. Bjerke's first opportunity to challenge the Bureau's claims and evidence, and to present her evidence for the Bureau's consideration, was the June 4, 1997, hearing after her request for reconsideration of the November 1, 1996, order. *See Stewart,* at ¶¶ 34, 35. We therefore conclude the appropriate remedy for the Bureau's insufficient notice of October 11, 1996, is to reinstate Bjerke's benefits from November 1, 1996, through June 4, 1997.

## VIII

[¶ 25] The judgment is reversed insofar as it affirmed denial of all benefits from November 1, 1996, affirmed insofar as it denies benefits after June 4, 1997, and remanded for entry of judgment consistent with this opinion.

[¶ 26] VANDE WALLE, C.J., KAPSNER and NEUMANN, JJ., concur.

MARING, Justice, dissenting in part and concurring in part.

[¶ 27] I dissent from the majority opinion with the exception of part VII. In my opinion, the Bureau's conduct in this case is the type of adversarial action we have cautioned against and which we have indicated may require reversal. *Scott v. North Dakota Workers Compensation Bureau,* 1998 ND 221, ¶ 20, 587 N.W.2d 153; *Blanchard v. North Dakota Workers Compensation Bureau,* 1997 ND 118, ¶ 23, 565 N.W.2d 485.

[¶ 28] The Bureau's final order relied primarily on a letter written by Dr. Turner to Bjerke on October 7, 1996, in which he stated:

> Please use this correspondence as a letter to document your restrictions for return to work. Dr. Pinto's office did contact me and *based on the content of their recommendations,* it is my opinion that you are permanently disabled and

will not be returning to work at Imations. (Emphasis added.)

Based on this language, the Bureau concluded Bjerke was totally permanently disabled because of her non-work-related back condition.

[¶ 29] Bjerke argues Dr. Turner's letter is conclusory and does not comply with N.D.C.C. § 65-05-08.1. She also argues there is a difference between permanent "partial disability" and permanent "total disability." I agree. The Bureau's decision to terminate her vocational rehabilitation services and disability benefits because she was permanently disabled from all work as a result of her non-work-related back injury is rooted in Dr. Turner's letter. Dr. Turner's letter, however, is "based on the content of their [Dr. Pinto's] recommendations." Dr. Pinto's letter of October 1, 1996, advised Dr. Turner of some restrictions:

> I doubt very much if this patient is able to work on an assembly line at 3M. I also believe it would be very hard for her actually to do any work as she requires constant changing of position and also because she has constant symptoms. *I do not know if there would be a job at the sedentary level of duty on a part time basis for her.* (Emphasis added.)

Clearly Bjerke potentially was able to perform some amount of labor at a sedentary level of duty on a part-time basis within her back restrictions according to Dr. Pinto. She was not able to return to Imation, but the potential existed for her to do something else part-time in another line of work. When Dr. Turner's letter is read with Dr. Pinto's letter, it can only be fairly read to mean Bjerke was unable to return to any work at Imation or similar work, but there may be part-time sedentary work she could do in another line of work.

[¶ 30] The Bureau had a statutory obligation to provide services necessary to assist the claimant in the adjustments required by the injury, which include rehabilitation services. N.D.C.C. § 65-05.1-01(2) (1991). We have said that when the

Bureau is terminating benefits it has a statutory duty to "request" updated medical reports about the claimant's disability before terminating further disability benefits. *Frohlich v. North Dakota Workers Compensation Bureau,* 556 N.W.2d 297, 303 (N.D.1996). We have also said the Bureau has an affirmative duty to clarify any inconsistencies and to explain its reasons for disregarding medical evidence favorable to the worker. *Blanchard,* 1997 ND 118, ¶ 23, 565 N.W.2d 485. In this case, where Bjerke potentially retains some earning capacity despite her work-related injury and non-work-related condition, the Bureau has the obligation to clarify the extent of that retained earning capacity before it terminates her benefits. In this case, it did not. Instead, although the Bureau serves as the fact finder as well as the advocate in resolving and weighing evidence, it persists in diminishing its role in clarifying inconsistencies in medical evidence. I find this indicative of a purely adversarial approach.

[¶ 31] I would reverse and remand for reinstatement as of November 1, 1996, of her disability and rehabilitation benefits. For these reasons, I dissent.

[¶ 32] Mary Muehlen Maring