2015 ND 205

**Calvin ANDERSON, Appellant**

v.

**WORKFORCE SAFETY AND INSURANCE, Appellee.**

No. 20140346.

Supreme Court of North Dakota.

Aug. 25, 2015.

Amanda J. Brossart (argued) and Steven L. Latham (on brief), Bismarck, ND, for appellant.

Douglas W. Gigler, Special Assistant Attorney General, Fargo, ND, for appellee.

SANDSTROM, Justice.

[¶ 1] Calvin Anderson appeals from a judgment affirming a Workforce Safety and Insurance ("WSI") decision approving a vocational rehabilitation plan. Because a reasoning mind reasonably could have determined the factual conclusions reached by WSI were proven by the greater weight of the evidence in the record and the vocational rehabilitation plan would return Anderson to substantial gainful employment that was reasonably attainable in light of his injury, we affirm the district court judgment.

I

[¶ 2] In January 2005, after slipping on an icy driveway and injuring his right shoulder and left hip while working as an inspector-tester for Finley Engineering, Anderson reported the injury to WSI. On January 28, 2005, WSI accepted liability for the right shoulder and left hip injury and paid benefits to Anderson. During the following three years, Anderson worked in similar positions with different companies. After his injury, and throughout 2010, Anderson sought medical and chiropractic care from numerous providers to address complications with his right shoulder, neck, and left hip.

[¶ 3] In April 2010, WSI issued a notice of its decision to deny further liability for Anderson's left hip injury on the grounds that the arthritis of which he complained had been present before he sustained the work injury in 2005. After finding no

objective medical evidence indicating Anderson's hip condition was caused by his work injury, WSI issued its order denying liability for his hip condition.

[¶ 4] In June 2010, the rehabilitation consultant hired by WSI issued its report. The report noted that Anderson's treating physician, Steven Kraljic, M.D., had released Anderson to perform his pre-injury position without work restrictions. In accordance with N.D.C.C. § 65–05.1–01(4), the report contained a vocational rehabilitation plan which determined the first appropriate rehabilitation option would be for Anderson to "return to the same occupation, any employer." Later in June, WSI issued a notice of its intention to discontinue temporary disability benefits on the grounds Anderson had been released to work without restrictions and he was deemed capable of performing his pre-injury occupation. Shortly after, WSI advised Anderson that because it determined he had the transferable skills to return to his pre-injury work as an inspector, he was required to make a good-faith search for such a job.

[¶ 5] On July 22, 2010, WSI issued its order denying further disability and rehabilitation benefits because Anderson had been released to return to his pre-injury occupation. Anderson appealed from the order denying further disability and rehabilitation benefits, as well as the order denying specific benefits regarding the condition of his left hip, and requested a hearing. On December 20, 2010, an administrative hearing was held on both appeals. After the hearing, the administrative law judge ("ALJ") issued a final order affirming WSI's denial of specific benefits and further disability and rehabilitation benefits. Anderson appealed the ALJ's final order to the district court. The district court remanded the case to the ALJ, instructing her to make further factual determinations regarding whether WSI had accepted liability for Anderson's neck injuries. Prior to a remand hearing, WSI accepted liability for Anderson's neck injuries.

[¶ 6] On December 29, 2013, the ALJ affirmed WSI's earlier order. The ALJ found WSI had considered the condition of Anderson's neck at the time it formulated the vocational rehabilitation plan and the plan provided Anderson a reasonable opportunity to obtain substantial gainful employment in North Dakota. Anderson again appealed the ALJ's order to the district court, and the district court again affirmed. Anderson then appealed to this Court.

[¶ 7] The district court had jurisdiction under N.D. Const. art. VI, § 8, and N.D.C.C. §§ 27–05–06, 65–10–01, and 28–32–42. Anderson's appeal was timely under N.D.R.App.P. 4(a) and N.D.C.C. § 28–32–49. This Court has jurisdiction under N.D. Const. art. VI, §§ 2 and 6, and N.D.C.C. § 28–32–49.

## II

[¶ 8] In an appeal of a WSI order, under N.D.C.C. §§ 28–32–46 and 28–32–49, we are required to affirm an order by an administrative agency unless:

1. The order is not in accordance with the law.

2. The order is in violation of the constitutional rights of the appellant.

3. The provisions of this chapter have not been complied with in the proceedings before the agency.

4. The rules or procedure of the agency have not afforded the appellant a fair hearing.

5. The findings of fact made by the agency are not supported by a preponderance of the evidence.

6. The conclusions of law and order of the agency are not supported by its findings of fact.

7. The findings of fact made by the agency do not sufficiently address the evidence presented to the agency by the appellant.

8. The conclusions of law and order of the agency do not sufficiently explain the agency's rationale for not adopting any contrary recommendations by a hearing officer or an administrative law judge.

N.D.C.C. § 28–32–46. "[W]e do not make independent findings of fact or substitute our judgment for that of the agency. We determine only whether a reasoning mind reasonably could have determined that the factual conclusions reached were proved by the weight of the evidence from the entire record." *Power Fuels, Inc. v. Elkin*, 283 N.W.2d 214, 220 (N.D.1979). Questions of law, including the interpretation of a statute, are fully reviewable on appeal from an agency decision. *Lawrence v. North Dakota Workers Comp. Bureau*, 2000 ND 60, ¶ 11, 608 N.W.2d 254.

### III

[¶ 9] Anderson argues WSI's selection of a vocational rehabilitation plan under N.D.C.C. ch. 65–05.1 is not physically appropriate because no reasoning mind, after a review of his medical conditions, could conclude he is capable of completing the work required in his vocational rehabilitation plan. Anderson argues WSI failed to properly consider his difficulties with driving when it formed his vocational rehabilitation plan.

[¶ 10] Chapter 65–05.1, N.D.C.C., governs WSI's vocational rehabilitation services. Specifically, N.D.C.C. § 65–05.1–01(3) provides, in part:

It is the goal of vocational rehabilitation to return the disabled employee to substantial gainful employment with a minimum of retraining, as soon as possible after an injury occurs. "Substantial gainful employment" means bona fide work, for remuneration, which is reasonably attainable in light of the individual's injury, functional capacities, education, previous occupation, experience, and transferable skills. . . .

A vocational rehabilitation plan is appropriate if it satisfies the requirements of N.D.C.C. ch. 65–05.1 and gives the claimant a reasonable opportunity to obtain substantial gainful employment. *Paul v. N.D. Workers Comp. Bureau*, 2002 ND 96, ¶ 8, 644 N.W.2d 884. In determining whether certain employment options present an opportunity for substantial gainful employment, WSI must take a claimant's preexisting functional limitations into account. *Genter v. Workforce Safety & Ins. Fund*, 2006 ND 237, ¶ 14, 724 N.W.2d 132. "The Legislature intended for claimants to be provided with actual rehabilitation, with a realistic opportunity to return to work, and not a theoretical rehabilitation on paper only." *Id.* (citations omitted). WSI bears the burden of establishing that a vocational rehabilitation plan is appropriate. *Hoffman v. N.D. Workers Comp. Bureau*, 2002 ND 138, ¶ 15, 651 N.W.2d 601.

[¶ 11] " 'WSI's selection of a vocational rehabilitation plan will not be reversed when there is evidence from which a reasoning mind could have reasonably concluded that the rehabilitation plan would return the injured worker to substantial gainful employment which was reasonably attainable in light of his injury. . . .' " *Higginbotham v. Workforce Safety & Ins.*, 2014 ND 147, ¶ 8, 849 N.W.2d 233 (quoting *Bishop v. Workforce Safety & Ins.*, 2012 ND 217, ¶ 8, 823 N.W.2d 257). In assessing the validity of a vocational rehabilitation plan, the question " 'is whether the plan, at the time [it was for-

mulated], gave [the injured worker] a reasonable opportunity to obtain substantial gainful employment.'" *Hoffman v. N.D. Workers Comp. Bureau,* 1999 ND 66, ¶ 9, 592 N.W.2d 533 (emphasis omitted) (quoting *Lucier v. North Dakota Workers Comp. Bureau,* 556 N.W.2d 56, 60 (N.D. 1996)); *see also Svedberg v. North Dakota Workers Comp. Bureau,* 1999 ND 181, ¶ 16, 599 N.W.2d 323.

[¶ 12] Despite Anderson's contentions, the ALJ found the vocational rehabilitation plan considered the condition of Anderson's neck. In her decision affirming WSI's orders denying disability and rehabilitation benefits, the ALJ reviewed the medical evidence regarding Anderson's neck and made the following findings:

> The greater weight of the evidence shows that at the time of the vocational rehabilitation plan, Mr. Anderson was physically capable of performing the job of inspector/tester. He was released to work with restrictions that did not prevent him from performing this light duty work. Mr. Anderson complains that he is unable to do the job because he cannot tolerate driving. Over the years, Mr. Anderson has attributed his problem driving to neck pain. But Dr. Kraljic, who treated Mr. Anderson's neck pain, was aware of Mr. Anderson's complaints about driving and released Mr. Anderson to do that job. Dr. Kraljic was provided with a Field Inspector Job Description that advised that the worker must have a valid driver's license, that most assignments are performed at a job site, and that travel was required "approximately 90% of the time."

[¶ 13] Although Anderson disagrees with Dr. Kraljic's diagnosis regarding his neck and work restrictions, we do not "substitute our judgment for that of the agency" but instead "determine only whether a reasoning mind reasonably could have determined that the factual conclusions reached were proved by the weight of the evidence from the entire record." *Thompson v. Workforce Safety & Ins.,* 2006 ND 69, ¶ 9, 712 N.W.2d 309; *Power Fuels, Inc. v. Elkin,* 283 N.W.2d 214, 220 (N.D.1979). Here the evidence in the record allows WSI to reasonably conclude Anderson was capable of performing his pre-injury occupation. For example, in 2010, because WSI was aware Anderson had complained of neck pain, it provided his treating physician, Dr. Kraljic, with a Field Inspector Job Description that described the type of work required for an inspector. After reviewing the job description, Dr. Kraljic released Anderson to his pre-injury occupation without any work restrictions. As a result, WSI approved the vocational rehabilitation plan and notified Anderson of its intent to discontinue his temporary disability benefits. Moreover, the record also reflects that Anderson, after suffering his work-related injury, worked the same job that was recommended by WSI, an inspector-tester, for two different employers. Because the evidence in the record reflects that a reasoning mind could have reasonably concluded the vocational rehabilitation plan would return Anderson to substantial gainful employment which was reasonably attainable in light of his injury and which would substantially rehabilitate his earning capacity, we affirm the ALJ's conclusion that Anderson's vocational rehabilitation plan was valid and properly considered his neck pain.

### IV

[¶ 14] Anderson also argues WSI's selection of a vocational rehabilitation plan under N.D.C.C. ch. 65–05.1 is not physically appropriate, because the ALJ failed to weigh the conflicting medical evidence presented by Dr. Kraljic, who released Anderson to work with no re-

strictions, and Dr. Krause, who imposed driving restrictions after the formation and adoption of Anderson's vocational rehabilitation plan, and failed to adequately explain her reasoning for rejecting evidence favorable to Anderson. Anderson also argues that although Dr. Krause's diagnosis was given after the vocational rehabilitation plan was approved, WSI should have taken the conflicting medical testimony into consideration and ordered a functional capacity assessment to ascertain whether he could perform the job duties of his former occupation.

[¶ 15] WSI argues the ALJ correctly concluded the viability of WSI's vocational rehabilitation plan because viability of a rehabilitation plan is measured at the time WSI makes its selection. WSI cites *Lucier v. N.D. Workers Comp. Bureau*, 556 N.W.2d 56, 60 (N.D.1996), for the proposition that the question for this Court on appeal "is whether the [rehabilitation] plan, *at the time*, gave [the claimant] a reasonable opportunity to obtain substantial gainful employment...." (Emphasis added.) Because the work restrictions imposed by Dr. Krause came after WSI had approved the vocational rehabilitation plan for Anderson, WSI argues it was under no obligation to consider the restrictions in formulating the vocational rehabilitation plan.

[¶ 16] Under N.D.C.C. § 65–05–08.3, WSI is required to resolve conflicting medical evidence before it by considering the following factors:

a. The length of the treatment relationship and the frequency of examinations;

b. The nature and extent of the treatment relationship;

c. The amount of relevant evidence in support of the opinion;

d. How consistent the opinion is with the record as a whole;

e. Appearance of bias;

f. Whether the doctor specializes in the medical issues related to the opinion; and

g. Other relevant factors.

In the present case, in approving Anderson's vocational rehabilitation plan requiring him to return to his same occupation with any employer, the record reflects WSI relied on medical evidence contained in the record, numerous medical opinions and work releases from Anderson's treating physicians, and an independent medical examination. For example, before Anderson's vocational rehabilitation plan was approved, Dr. Kraljic and Coleen Staloch, a certified physician assistant, both of whom treated Anderson's neck and shoulder injuries, released Anderson with no work restrictions. The evidence contained in the record reflects that Dr. Kraljic was aware Anderson began to report neck pain more than two years after the work injury, but he nevertheless decided Anderson could be released without work restrictions. In addition to relying on Dr. Kraljic's medical opinion, the record reflects WSI also considered the medical opinion of Dr. Carole Krause, a physiatrist who saw Anderson approximately one month after the vocational rehabilitation plan was issued. According to her medical reports, upon examining Anderson, Dr. Krause observed that he had decreased range of motion in his left hip, fair range of motion in his neck, and fair to good range of motion in his shoulder. Dr. Krause noted Anderson had cervical stenosis (narrowing of the spinal canal in the neck) and degenerative disc disease in his neck and a history of left hip osteoarthritis. Because of Anderson's complaints regarding his work restrictions, Dr. Krause recommended tentative work restrictions that limited the amount of

time Anderson could drive to ten to fifteen minutes at a time.

[¶ 17] Although Anderson argues WSI failed to adequately explain its reasoning for not weighing the medical evidence presented by Dr. Krause, the record reflects otherwise. In the agency's final order dated December 29, 2013, the ALJ weighed the conflicting medical opinion presented by Dr. Kraljic and Dr. Krause and concluded that Dr. Krause's reliance on Anderson's "subjective complaints" regarding his back pain and difficulties with driving was outweighed by the medical opinion of Dr. Kraljic. While this explanation is rather brief, we conclude the ALJ adequately addressed the inconsistencies in the medical opinions, provided a reasonable basis for her findings, and sufficiently explained the reasoning for her conclusion to disregard the medical evidence offered by Dr. Krause. *See Across Big Sky Flow Testing, LLC v. Workforce Safety & Ins.*, 2014 ND 236, ¶ 14, 857 N.W.2d 380.

## V

■■■ [¶ 18] Anderson argues WSI failed to prove the vocational rehabilitation plan provided him with a reasonable opportunity to obtain substantial employment, because WSI failed to provide a job market analysis in order to prove Anderson had a reasonable opportunity to obtain the employment specified in the vocational rehabilitation plan.

[¶ 19] In support of his arguments, Anderson cites to *Paul v. N.D. Workers Comp. Bureau*, 2002 ND 96, 644 N.W.2d 884, for the proposition that WSI may not presume the availability of sufficient job opportunities within a claimant's physical limitations or shift the burden of disproving the availability of sufficient job opportunities. In *Paul*, a claimant was injured during the course of his employment, and WSI accepted liability and paid disability benefits and medical expenses. *Id.* at ¶ 2. After the claimant underwent a functional capacity evaluation, WSI adopted a vocational rehabilitation plan for the claimant to return to work in the Phoenix area as a sales attendant, service establishment counter attendant, or automobile rental clerk, and issued an order denying the claimant any further disability and vocational rehabilitation benefits, which the claimant appealed. *Id.* at ¶¶ 2–3. Despite the claimant's objection, the ALJ upheld WSI's order because it presumed there were employment opportunities for the claimant within the suggested occupations and because the claimant had not proven otherwise. *Id.* at ¶ 10. On appeal to this Court, WSI may not rely on a presumption to establish that a vocational rehabilitation plan provides a reasonable opportunity for employment within a claimant's restrictions; instead, WSI must rely on the evidence presented at the hearing to prove the plan provides a reasonable opportunity for employment within a claimant's restrictions. *Id.* at ¶ 11. In the present case, Anderson argues, as in *Paul*, it is inappropriate for WSI to simply presume there are sufficient job opportunities within his physical limitations.

[¶ 20] Conversely, WSI argues the vocational rehabilitation plan was valid even though the vocational consultant did not conduct labor market research to determine whether there were sufficient positions available to Anderson to provide him a reasonable opportunity for employment. WSI argues that according to N.D.C.C. § 65–05.1–02.1, a vocational consultant's report is required to include labor market research only when the first appropriate option to return the employee to substantial gainful employment is listed in N.D.C.C. § 65–05.1–01(4)(e–g). *See generally Held v. N.D. Workers Comp. Bureau*, 540 N.W.2d 166, 169 (N.D.1995) (employment placement statistics were used to

prove claimant had opportunity to obtain substantial gainful employment after completing retraining as prescribed by N.D.C.C. § 65–05.1–01(4)(g)). Because the first appropriate option to return Anderson to substantial gainful employment was to return him to the same occupation with any employer, WSI argues it was unnecessary to provide labor market research.

[¶ 21] According to N.D.C.C. § 65–05.1–02.1(2), depending on which option is identified as the appropriate option to return the employee to substantial gainful employment, the vocational consultant's report must contain findings that:

   a. Identify jobs in the local or statewide job pool and the employee's anticipated earnings from each job; or

   b. Describe an appropriate retraining program, the employment opportunities anticipated upon the employee's completion of the program, and the employee's anticipated earnings.

With that said, N.D.C.C. § 65–05.1–02.1(2) does not specify which rehabilitation options require market research about job availability and earning potential as required by N.D.C.C. § 65–05.1–01(4). In her decision affirming WSI's decision to deny further disability and rehabilitation benefits, the ALJ concluded that because WSI did not identify a rehabilitation option within the local or statewide job pool suited to Anderson's education, experience, and marketable skills, the vocational consultant's report "was not required to contain findings that identified jobs in the local or statewide job pool." Furthermore, the ALJ agreed with the vocational consultant's testimony that because Anderson was returned to the same occupation with any employer, she was not required to include such findings. The ALJ then discussed Anderson's reliance on *Paul* for the proposition that the vocational consultant was required to do labor market research:

In *Paul*, three different occupations in the Phoenix, Arizona area had been identified as suitable for the claimant. That is not the case here. No alternative occupations have been identified for Mr. Anderson. The first appropriate rehabilitation option identified is a return to the same occupation—the same job he had been performing for various employers after his work injury. That he had been performing this job after his work injury, for several employers, shows that Mr. Anderson had a reasonable opportunity for employment within his restrictions in light of his injury, functional capacities, education, previous occupation, experience, and skills and the job met the wage test. *Paul* is distinguishable and does not indicate that the vocational consultant's report is deficient under § 65–05.1–02.1.

[¶ 22] Although N.D.C.C. § 65–05.1–02.1 is unclear as to when a vocational consultant's report must identify jobs in the local or statewide job pool and the employee's anticipated earnings from each job, we defer to WSI's interpretation and application of N.D.C.C. § 65–05.1–02.1, which appears to be reasonable and consistent with the statutory language. *See Medcenter One, Inc. v. North Dakota State Bd. of Pharmacy*, 1997 ND 54, ¶ 17, 561 N.W.2d 634 (an "agency's long-standing and practical interpretation of a statute is entitled to deference" unless it is contrary to the unambiguous language of the statute). Despite the vocational consultant's report's lack of job market research, evidence contained in the record supports the hearing officer's finding that WSI provided Anderson with a vocational rehabilitation plan that presented him with a reasonable likelihood of obtaining substantial gainful employment as an inspector-tester. As

noted by the ALJ, Anderson worked for two engineering companies as an inspector-tester after his work-related injury, and this position was within his restrictions in light of his injury, functional capacities, education, experience, and skills and met the wage test prescribed in N.D.C.C. § 65–05.1–01(3); *see Paul v. N.D. Workers Comp. Bureau*, 2002 ND 96, ¶ 16, 644 N.W.2d 884 (VandeWalle, C.J., concurring) (this Court should not require "proof of the obvious to an inordinate point"). Therefore, because a reasoning mind could have reasonably concluded the vocational rehabilitation plan satisfied the requirements of N.D.C.C. ch. 65–05.1 and provided Anderson with a reasonable opportunity to obtain substantial gainful employment, we affirm the ALJ's conclusion that Anderson's vocational rehabilitation plan was valid. *See Paul*, at ¶ 8 (a vocational rehabilitation plan is appropriate if it satisfies the requirements of N.D.C.C. ch. 65–05.1 and gives the claimant a reasonable opportunity to obtain substantial gainful employment).

## VI

[¶ 23] We have reviewed the record, and we conclude a reasoning mind reasonably could have determined the vocational rehabilitation plan would return Anderson to substantial gainful employment that was reasonably attainable in light of his injury. We therefore affirm the district court judgment.

[¶ 24] GERALD W. VANDE WALLE, C.J., DANIEL J. CROTHERS and LISA FAIR McEVERS, JJ., concur.

KAPSNER, Justice, dissenting.

[¶ 25] I respectfully dissent from the majority opinion. Based on a review of this record, I do not believe the ALJ adequately explained her reasons for disregarding the medical evidence that was favorable to Anderson, particularly in light of the job description requiring traveling "approximately 90% of the time."

[¶ 26] The goal of vocational rehabilitation is to return the disabled employee to "substantial gainful employment with a minimum of retraining, as soon as possible after an injury occurs. 'Substantial gainful employment' means bona fide work, for remuneration, which is reasonably attainable *in light of the individual's injury, functional capacities,* education, previous occupation, experience, and transferable skills...." N.D.C.C. § 65–05.1–01(3) (emphasis added).

[¶ 27] WSI has the burden of establishing that a vocational rehabilitation plan is appropriate for the injured worker. *Shotbolt v. N.D. Workforce Safety and Ins.*, 2010 ND 13, ¶ 20, 777 N.W.2d 853. When determining whether the employment options identified in the rehabilitation plan present a realistic opportunity for substantial gainful employment, WSI must consider all of the claimant's functional limitations. *See id.; Genter v. Workforce Safety & Ins. Fund*, 2006 ND 237, ¶ 14, 724 N.W.2d 132. "[F]unctional limitations which existed at the time the claimant was performing the job are elements of the employee as the employer 'found' him, and are valid factors which should be taken into consideration when the Bureau determines whether certain employment options present an opportunity for 'substantial gainful employment.'" *Svedberg v. N.D. Workers Comp. Bureau*, 1999 ND 181, ¶ 14, 599 N.W.2d 323.

[¶ 28] "If the Bureau, the consultant, the medical assessment team, and the treating physician assess the claimant as a hypothetical 'perfect' individual with only the current work-related disability, and do not take the worker's actual whole-person functional capacities into account, any vocational rehabilitation plan based upon that assessment will be flawed and un-

workable." *Svedberg*, 1999 ND 181, ¶ 17, 599 N.W.2d 323. If a vocational rehabilitation plan is to be meaningful, common sense dictates that the injured worker's actual functional abilities must be considered. *Id.* "The Legislature intended for claimants to be provided with actual rehabilitation, with a realistic opportunity to return to work, and not a theoretical rehabilitation on paper only." *Genter*, 2006 ND 237, ¶ 14, 724 N.W.2d 132.

[¶ 29] As the majority notes, after Anderson appealed the ALJ's final order to the district court, the district court remanded the case to the ALJ instructing her to make further factual determinations regarding whether WSI had accepted liability for Anderson's neck injuries. Majority opinion at ¶ 5. Prior to a remand hearing, *WSI accepted liability for Anderson's neck injuries. Id.* (emphasis added). Because WSI accepted liability for Anderson's neck injuries, his injuries are considered work-related injuries. The ALJ made extensive findings of fact summarizing Anderson's medical treatment in both of her orders, before and after the remand, specifically outlining Anderson's continued complaints of neck pain from 2005 to 2010:

On October 21, 2005, Mr. Anderson saw Dr. Fair and complained of right shoulder and neck pain. He had ... normal cervical range of motion. X-rays showed a loss of normal cervical lordosis and advanced cervical disc degeneration. On October 22, October 26, November 15, November 21, 2005 and February 6, 2006, Mr. Anderson saw Dr. Fair. There was no mention of any problems driving.

... Mr. Anderson again saw Dr. Wyman on February 13, 2006. He reported that his neck was a little stiff and achy....

On April 7, 2006, Mr. Anderson had an independent medical examination by Dr. Jeff Askew, D.C.... [Anderson] complained of neck pain which he described as a "dull ache" with an intensity of 0/10 to 2/10.... [Anderson] said driving does not aggravate the pain. He felt his neck and shoulder pain were about 60–75% improved. Dr. Askew examined Mr. Anderson and diagnosed mechanical cervical spine pain secondary to vertebral segmental dysfunction.... [W]ith the degree of pre-existing degenerative changes found in Mr. Anderson's neck, he was likely to have some increasing level of symptoms through the years related to the natural progression of this pre-existing condition.

... [O]n October 5, 2007, Mr. Anderson saw Dr. Charles Whitney, D.C. and reported pain between the shoulder blades and that driving aggravates his pain.... [O]n December 27, 2007, Mr. Anderson ... complained of neck pain that is made worse by driving.... He saw Dr. Whitney again on September 26, 2008 and said that his neck had been "pretty good."

....

On March 11, 2009, Mr. Anderson saw Shanna Kittleson, FNP ... for increased arm weakness, neck pain, and left hip pain.... Ms. Kittleson ordered an MRI of the cervical spine, which on March 20, 2009 showed disc spurs, severe bilateral neural foraminal stenosis, and moderate central canal stenosis (degenerative disc disease with cervical stenosis).

On March 13, 2009, Mr. Anderson began treatment with Dr. John Badinger, D.C.... complain[ing] of neck pain and headaches. He complained that the pain gets worse while driving and using his arms, and that he "has been getting worse over the years." ... On March 16, 2009, Mr. Anderson ... indicated that he had extra pain while traveling

and that his pain was gradually worsening. He ... indicated that he had moderate neck pain and that he could not drive as long as he wanted....

On March 23, 2009, Mr. Anderson saw Lori Klabunde, PA–C ... regarding his neck pain and bilateral shoulder pain. Upon examination, he had 75% normal cervical range of motion and normal upper extremity strength. Ms. Klabunde recommended physical therapy and released Mr. Anderson to work, lifting no greater than ten pounds....

On March 25, 2009, Mr. Anderson saw Dr. Wyman. He noted that Mr. Anderson had been advised that he may do better if he doesn't do any driving "or at least he indicates that driving does bother him and has been advised by WSI if he can't drive that potentially they could retrain him." Dr. Wyman continued Mr. Anderson's light duty restrictions but advised that he should avoid "reaching out such as driving at this time." Dr. Wyman completed a Capability Assessment and indicated that Mr. Anderson ... was to avoid reaching, such as driving for greater than one hour per shift.

On March 31, 2009, Mr. Anderson reported ... "[h]e has the most difficulty after driving." On April 1, 2009, Dr. Wyman ... released Mr. Anderson to work with lifting restrictions. No driving restrictions were noted. On April 2, 2009, Mr. Anderson reported to physical therapy ... that his neck was a little sore, and that he especially notices this when driving on rough roads. On April 6, 2009, Mr. Anderson reported that if he doesn't drive, he actually does quite well. On April 16, 2009, Mr. Anderson reported improvement in his neck pain and that "really driving is just his aggravating activity."

On April 20, 2009, Mr. Anderson saw Dr. Wyman and again complained that driving was very difficult. He reported driving about 1½ to 2 hours before he had to stop. Dr. Wyman noted tenderness in the muscles at the base of Mr. Anderson's neck and somewhat limited range of motion because of the pain. On April 29, 2009, Mr. Anderson reported that he couldn't hold his arms up to drive for more than 20 or 30 minutes. Dr. Wyman released Mr. Anderson to work full time and drive up to 20 or 30 minutes every 3 to 4 hours.

The same day, Mr. Anderson saw Dr. Badinger ... and reported that he could hardly drive at all because of severe neck pain.

From April to June, 2009, Mr. Anderson continued to complain that driving aggravated his neck and right shoulder pain....

. . . .

... On August 6, 2009, Mr. Anderson reported that he had done some driving "and is more aggravated with neck discomfort than anything."

On September 22, 2009, Mr. Anderson saw Coleen Staloch, FNP, P.A.–C.... She noted that Mr. Anderson's job "involves driving and when he does drive, he feels that it really has been bothering his neck, i.e., when he drove up here today." ... "I strongly suspect his neck concerns are going to limit him and not allow him to do that anyway as he is probably having trouble with repetitively just turning his neck even with driving and with his lifting up to four pounds. We are going to allow him to follow up with Lori Klabunde, P.A.–C, to start the evaluation on his neck."

On October 2, 2009, Mr. Anderson saw Lori Klabunde regarding his neck pain. Ms. Klabunde noted mild cervical range

of motion deficits and significant stenosis at C5–6 and more mildly at C6–7.

On October 27, 2009, Mr. Anderson saw Dr. Steven Kraljic, neurosurgeon, regarding neck pain shooting into his arms bilaterally. Dr. Kraljic noted that an MRI from March 2009 showed significant dis[c] degeneration at C5–6 and C6–7 and that the changes were causing significant compression of the C6 and C7 nerve roots bilaterally "and I do believe are contributing significant[ly] to his symptoms." Dr. Kraljic recommended surgery and fusion of C5–6 and C6–7 or steroid injection.

. . . .

On December 3, 2009, WSI requested vocational rehabilitation services from Corvel Corporation. . . . The vocational consultant noted Mr. Anderson's complaints of neck and hip pain and that when driving, he has good and bad days "and it depends on the road and weather." On May 5, 2010, Mr. Anderson called the rehabilitation consultant and reported that he had traveled to Fargo recently and "had pain in his neck at about Jamestown."

. . . .

On December 23, 2009, Coleen Staloch returned Mr. Anderson to work with a few restrictions. . . . She imposed no driving restrictions.

. . . .

On January 13, 2010, Mr. Anderson . . . reported worsening left hip pain and persistent neck pain aggravated with jarring movement to the spine, especially when driving over rough surfaces. Mr. Anderson reported being able to tolerate sitting/driving for 45 to 60 minutes. . . .

. . . .

On April 29, 2010, Mr. Anderson followed up with Dr. Kraljic. . . . Dr. Kral-jic . . . stated that "he has no restrictions."

On May 11, 2010 . . . [Anderson] reported chronic neck and right arm pain, "especially neck." He complained of moderate pain with driving longer than one to two hours and said that he "is a traveling engineer, currently not working due to inability to tolerate longer periods of sitting/driving secondary to aggravation, especially neck and left hip pain."

(Citations omitted.)

[¶ 30] All of Anderson's complaints of neck pain, spanning from 2005 to 2010, that were outlined in the ALJ's orders were made *before* he was released by Dr. Kraljic "without restrictions." In the ALJ's order after the remand, the ALJ noted:

The greater weight of the evidence shows that the first appropriate rehabilitation option for Mr. Anderson is return to the same occupation with any employer. The greater weight of the evidence shows that at the time of the vocational rehabilitation plan, Mr. Anderson was physically capable of performing the job of inspector/tester. He was released to work with restrictions that did not prevent him from performing this light duty work. Mr. Anderson complains that he is unable to do the job because he cannot tolerate driving. Over the years, Mr. Anderson has attributed his problem driving to neck pain. But Dr. Kraljic, who treated Mr. Anderson's neck pain, was aware of Mr. Anderson's complaints about driving and released Mr. Anderson to do that job. Dr. Kraljic was provided with a Field Inspector Job Description that advised that the worker must have a valid driver's license, that most assignments are performed at a job site, and that travel was required "approximately 90% of the time." Dr.

Krause limited Mr. Anderson's driving to 10 to 15 minutes, but she did so based on Mr. Anderson's subjective complaints made years after the work injury and after the vocational consultant's report.

[¶ 31] In the ALJ's order after the remand, the ALJ noted:

[WSI's counsel] conceded that there was sufficient evidence in the record upon which the ALJ could determine that WSI had accepted liability for Mr. Anderson's neck condition and that it had liability after June 16, 2010, the date Dr. Kraljic released Mr. Anderson to return to work without restrictions. [WSI's counsel] also conceded that WSI was required to consider Mr. Anderson's neck condition when it determined the first appropriate rehabilitation option. Accordingly, the parties agreed that the sole issue for hearing was "what effect, if any, did Mr. Anderson's neck condition have on the validity of WSI's vocational rehabilitation plan."

WSI conceded it was liable for Anderson's neck injuries, and the ALJ made extensive findings of fact regarding Anderson's neck pain. However, upon reviewing the ALJ's order after the remand, the ALJ appears to have classified Anderson's neck pain as a separate injury, referring to his neck injuries as "subjective complaints made years after the work injury." The ALJ did not consider Anderson's neck pain a "work-related injury," and she discounted Dr. Krause's medical opinions and driving restrictions for Anderson because they were "based on Mr. Anderson's subjective complaints ... and [made] after the vocational consultant's report."

[¶ 32] This Court has previously held the Bureau need not consider any medical limitations a claimant suffers from subsequent non-work-related injuries. *See Holtz v. N.D. Workers Comp. Bureau*, 479 N.W.2d 469, 471 (N.D.1992). In *Bjerke v. N.D. Workers Comp. Bureau*, 1999 ND 180, ¶¶ 21–22, 599 N.W.2d 329, this Court also held a claimant whose work-related disability has resolved, but who remains disabled due to a subsequent non-work-related disability, is not entitled to continued disability benefits. Here, unlike in *Holtz* and *Bjerke*, WSI conceded it was liable for Anderson's neck injuries, and the purpose of the hearing on remand was to determine "what effect, if any, did Mr. Anderson's neck condition have on the validity of WSI's vocational rehabilitation plan." The ALJ attempted to distance Anderson's neck injuries from his "work injury" and discounted medical evidence from Dr. Krause that was favorable to Anderson.

[¶ 33] I do not believe the ALJ adequately explained her reasons for disregarding the medical evidence that was favorable to Anderson, particularly in light of the job description requiring traveling "approximately 90% of the time." *See Bergum v. N.D. Workforce Safety and Ins.*, 2009 ND 52, ¶ 17, 764 N.W.2d 178 ("WSI must consider the entire record, clarify inconsistencies, and adequately explain its reasons for disregarding medical evidence favorable to the claimant.") (citation omitted).

[¶ 34] In the ALJ's conclusions of law section in her order after the remand, the ALJ stated, "Mr. Anderson had no driving limitations at the time of the injury or on the date of the rehabilitation consultant's report." The ALJ acknowledged Anderson's argument that his rehabilitation option was inappropriate because Dr. Krause subsequently put driving restrictions on Anderson; however, she cited *Hoffman v. N.D. Workers Comp. Bureau*, 1999 ND 66, ¶ 12, 592 N.W.2d 533, for support, stating "the Bureau's assessment of a rehabilitation program's viability is judged by evidence the Bureau has before

it at the time it makes the decision." In *Stenvold v. Workforce Safety and Ins.*, 2006 ND 197, ¶¶ 5–6, 9, 722 N.W.2d 365, new medical evidence was obtained after WSI had entered a final order terminating disability benefits, and the claimant's doctor's recommendation was also not before the ALJ when the ALJ issued his decision. This Court held that evidence not before the ALJ or WSI could not be considered on appeal. *Id.* at ¶ 14. In this case, like in *Stenvold*, Anderson's new medical evidence with Dr. Krause was not before WSI when Anderson's vocational rehabilitation plan was issued; however, unlike in *Stenvold*, the ALJ *did* have such evidence before her.

[¶ 35] I would remand for further explanation of the ALJ's findings.

[¶ 36] CAROL RONNING KAPSNER.